**E. F. HUTTON & COMPANY Inc., a Delaware corporation, Plaintiff,**

v.

**MANUFACTURERS NATIONAL BANK OF DETROIT, a national banking corporation, and V.G.A. Co. (formerly Vernors, Inc.), a Michigan corporation, Defendants.**

**No. 28780.**

United States District Court
E. D. Michigan, S. D.

Sept. 16, 1966.

John A. Ziegler, Jr., Henry C. Cashen, II, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for plaintiff.

Richard D. Rohr, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., for Manufacturers Nat. Bank of Detroit.

John L. King, Thomas V. Giles, Berry, Moorman, King & Canfield, Detroit, Mich., for V. G. A. Co. (formerly Vernors Inc.)

## OPINION

FREEMAN, District Judge.

In 1959, Vernors Inc. (now known as V.G.A. Co., but referred to herein by its former name) issued debentures to which were attached stock warrants, each of which represented the right to purchase 100 shares of Vernors' stock at $8 per share. The debentures were retired in 1964, but certain of the warrants, in bearer form, remained outstanding.

On June 3, 1966, the Board of Directors and the stockholders of Vernors adopted a plan of liquidation, and the Directors immediately passed a resolution declaring the first liquidating dividend in the amount of $9 per share. Because each outstanding warrant was still convertible into 100 shares of stock if accompanied by a tender of $800 and, under the plan of liquidation, the newly acquired 100 shares could immediately become the basis of a $900 liquidating dividend, it was thought to be more convenient to allow each warrant holder to surrender his warrant to the corporation and receive in exchange a payment of $100. Thus, the warrant holder would be in the same position in which he would have been had he actually paid his $800, taken 800 shares of stock and been paid $900 by Vernors.

It should be kept in mind that the $100 per warrant paid by Vernors did not terminate its obligations to the warrant holders because Vernors is still liable to permit each holder to participate in any final liquidating dividend to the same extent that he would be allowed to participate if he owned the quantity of stock to which his warrants entitled him.

Plaintiff is a stock brokerage house and on July 7, 1966, according to its com-

plaint, one of its employees, a cashier who was not an officer of the firm, directed 168 warrants representing rights to purchase 16,800 shares of Vernors' stock to be delivered to the Manufacturers National Bank, which was duly acting as Vernors' liquidating agent. The warrants actually belonged to customers of the plaintiff but were held by plaintiff according to the well-recognized custom by which a broker retains possession of the security certificates of his customers in order to facilitate a quick sale at the customer's request. Plaintiff maintains that the cashier had no instructions to cause the warrants in question to be delivered to the bank. Indeed, plaintiff contends that only the day before the delivery, other of its employees had just completed sending letters to the customers to whom the warrants belonged seeking instructions regarding the disposition each customer wished to make of his warrants. Shortly after the delivery to Manufacturers was made, several of Hutton's customers informed Hutton that they wished not to exchange their warrants for the first liquidating dividend. Apparently, they, instead, wished to tender their warrants along with the appropriate sum of money and claim share certificates in return. It is Vernors' contention that once they obtained their certificates, they intended to commence proceedings in state court to challenge some aspects of the liquidation plan.

Manufacturers tendered a check for $16,800 to the plaintiff at the time when the 168 warrants in question were delivered to the bank. This amount represented the difference between the sum which would have been required to purchase the shares represented by the warrants and the first liquidating dividend payable on that number of shares. Hutton accepted the check and did nothing until July 21 when, it claims, the mistaken delivery was first brought to the notice of one of its officers. It then offered to return the $16,800 and requested Manufacturers to return the warrants. Upon Manufacturers' refusal to comply with this request, plaintiff sought and was granted a temporary restraining order by which this Court forbade Manufacturers from releasing the warrants from its custody or in any way cancelling them.

This present matter involves a request by plaintiff that the temporary restraining order be converted into a preliminary injunction and a demand by defendants that plaintiff's complaint, which seeks a permanent mandatory injunction compelling the return of the warrants, be dismissed for failure to state a claim upon which relief can be granted.

### Applicability of Uniform Commercial Code

■ Article 3 of the Code, M.S.A. § 19.3101 to § 19.3805, Comp.Laws 1948, §§ 440.3101–440.3805 [P.A.1962, Act No. 174], sets out the law governing so-called commercial paper. Article 8, M.S.A. § 19.8101 to § 19.8406, Comp. Laws 1948, §§ 440.8104–440.8106 [P.A. 1962, No. 174] deals with investment securities. An investment security is defined in section 19.8102, Comp.Laws 1948, § 440.8102 [P.A.1962, No. 174] as an instrument which

"(i) is issued in bearer or registered form; and

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."

The warrants in question, a copy of a sample of which is attached to defendants' brief, seem to meet each of these four tests, as the draftsmen of the Code suggested most stock purchase warrants would. M.S.A. § 19.8102, comment 1.

■ Once it is determined that a particular instrument is within the definition of an investment security, Article 3 drops out of the picture and Article 8 remains as the sole source of the law governing the rights of the parties to a transaction involving the security. M.S.A. § 19.8102(b).

■ Unfortunately, Article 8 is much less detailed than Article 3. Many points are not treated in Article 8, while these same questions can be answered definitively in the case of an ordinary negotiable instrument where the governing law is contained in Article 3. Therefore, it seems appropriate to look to Article 3 for some guidance in a situation where a particular question regarding an investment security cannot be resolved just on the basis of the language in Article 8. After all, a bond in bearer form which is a negotiable instrument and governed by Article 3 could become an investment security if it is one of a series and is traded on an exchange. It does not seem that the rights of the parties in a transaction involving this instrument should be markedly different under Article 8 from what they would be under Article 3.

Much as in the case of negotiable instruments treated by Article 3, the rights of one in the possession of an investment security depend largely upon his status as a purchaser in good faith, a simple purchaser, or some other type of a possessor.

M.S.A. § 19.8201, Comp.Laws 1948, § 440.8201 [P.A. 1962, No. 174] defines an issuer as a person who:

"places or authorizes the placing of his name on a security (otherwise than as authenticating trustee, registrar, transfer agent or the like) to evidence that it represents a share, participation or other interest in his property or in an enterprise or to evidence his duty to perform an obligation evidenced by the security * * *."

There can be no question but that Vernors is the issuer of the warrants in question. Nor can there be much doubt that it was Vernors which received the warrants delivered by the plaintiff. Indeed, Vernors admits in its brief that Manufacturers Bank took the warrants in Vernors' name and on Vernors' behalf. Nevertheless, Vernors contends that, despite the fact that it is the issuer of the warrants, with respect to the warrants in controversy [1] it is also a bona fide purchaser. Doubtless there are instances in which the issuer of a security can later become a bona fide purchaser. The question is whether this case involves one of them.

A purchaser is one who takes by purchase (M.S.A. § 19.1201(33), Comp.Laws 1948, § 440.1201(33) [Pub.Acts 1962, No. 174]) and a purchase is said to include taking by sale, discount, negotiation, mortgage, pledge, lien, issue, reissue, gift or any other transaction creating an interest in property. M.S.A. § 19.1201(32), Comp.Laws 1948, § 440.1201(32) [P.A.1962, No. 174].

For purposes of Article 8, a bona fide purchaser is

"a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form * * *." (M.S.A. § 19.8302, Comp.Laws 1948, § 440.8302 [P.A.1962, No. 174].)

Although plaintiff's complaint alleges facts indicating that Vernors may have had notice that plaintiff was acting without authority when the warrants were delivered to Vernors' liquidating agent, for the purpose of the following discussion it will be assumed both that Vernors paid value for the warrants so delivered and that it did so in good faith and without notice of any adverse interest in them.

■ If Vernors can be treated as a bona fide purchaser in this case, the de-

---

1. It appears from briefs filed in connection with these present motions that the owners of some of the warrants delivered by Hutton are satisfied with taking their

$100 per warrant. Thus, fewer than 16,-800 warrants are actually still remaining in this controversy.

cision seems easy to reach. M.S.A. § 19.8301 provides:

"(1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.

"(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim." [2]

Two considerations suggest that, strict reading of the language of Article 8 and section 19.1201 notwithstanding, an issuer who takes a security in the course of performing his obligation under it is not a bona fide purchaser—or even a simple purchaser, for that matter.[3]

 The first consideration is the treatment accorded to the obligor on an ordinary negotiable instrument governed by Article 3. Whereas a bona fide purchaser within the meaning of Article 8 is a (1) purchaser (2) for value (3) in good faith and (4) without notice of an adverse claim, a holder in due course within the meaning of Article 3 is (1) a holder (2) for value (3) in good faith and (4) without notice of an adverse claim or defense or that the instrument is overdue. M.S.A. § 19.3302. Furthermore, just as the word "purchaser" is defined in the most sweeping language, the term "holder" is given great breadth by the draftsmen of the Code. In M.S.A. § 19.1201(20), a holder is defined as any-

one who is in possession of an instrument issued or indorsed to him or to bearer. It appears, therefore, that, if the definition of a holder in due course were taken strictly, the obligor on a bearer instrument could become a holder in due course when he pays it off, assuming that he acts in good faith and without notice of any adverse claims or defenses. He could have possession of a bearer instrument for which he would have given value by taking delivery under a preexisting obligation to purchase (i. e., to take some interest—the rights of a discharging obligor—in the instrument). Nevertheless, it is patently clear that an obligor discharging an instrument does not become a holder in due course in the process. In fact, he does not even become a holder. M.S.A. § 19.-3603(2) provides:

"Payment or satisfaction may be made with the consent of the holder by any person * * *. Surrender of the instrument to such a person gives him the rights of a *transferee*." (Emphasis supplied.)

The rights of a transferee are discussed in M.S.A. § 19.3201:

"Transfer of an instrument vests in the transferee such rights as the transferor has therein * * *."

In other words, one discharging an ordinary negotiable instrument by payment could have the rights of a holder in due course only if his immediate predecessor had similar rights; and it certainly cannot be argued that an agent, such as the plaintiff here, has the rights of a holder in due course against his principal.

 Unless the draftsmen of the Code meant to confer far more extensive rights upon the discharging obligor of corporate bonds traded on the market than they did upon the maker of a note

---

**2.** It seems clear that this provision even cuts off the claims of one of the parties to the transaction. Compare M.S.A. § 19.3305(1) and (2).

**3.** While it is true that when Vernors received through its agent the warrants in

question it was not performing the precise duty it had undertaken when it issued the securities, there can be no doubt that it took the warrants in the course of discharging its obligation on them. Compare M.S.A. § 19.3601(2).

not so traded who pays it off, the issuer of securities should not be treated as a bona fide purchaser by virtue of his discharging his own obligation under the securities.

The second consideration, based solely upon M.S.A. § 19.8306(2), dealing with the warranties which pass from a seller (or his broker, see M.S.A. § 19.8306(5)), provides:

"A person by transferring a security to a purchaser for value warrants only that

(a) his transfer is effective and rightful; and

(b) the security is genuine and has not been materially altered; and

(c) he knows no fact which might impair the validity of the security."

Thus, if an issuer, taking a security in the process of discharging his obligation under it, were a bona fide purchaser, or even a purchaser for value, he would have the transferor warranting to him that his own security is genuine and not materially altered. This is contrary to the common law position with regard to negotiable instruments (and also, incidentally, to the rule adopted by the draftsmen in writing Article 3). See M.S.A. § 19.3417 and accompanying comment 5. This unorthodox result should not casually be said to have been intended by the authors of the Code.

■ Actually, only a gross misconstruction of the Code could lead to such results; for subdivision (1) of M.S.A. § 19.8306 provides:

"A person who presents a security for registration of transfer or for payment or exchange warrants to the issuer that he is entitled to the registration, payment or exchange."

Any attempt to interpret section 19.8306 as a logical whole leads to the conclusion that one who presents a security to the issuer for discharge warrants only as specified in subsection (1). This could be for one of two reasons: either because a discharging issuer is not a purchaser for value and thus could not be protected by the warranties listed in subsection (2)

or, alternatively, because the scheme manifested by subsections (1) and (2) indicates that, even though a discharging issuer is a purchaser for value, he does not reap the benefit of the warranties normally made by a transferor to such a purchaser.

A further examination of Article 8 suggests that the former reason is the better one. Section 19.8306 by its terms does not indicate that the rule of subsection (1) is to be viewed as an exception to a broad principle set out in subsection (2) which would otherwise be applicable. On the other hand, in several other Article 8 provisions, the draftsmen have specifically noted that a particular type of purchaser, who would easily meet the definitional test of that term under normal circumstances, is not to be treated as a purchaser within the meaning of a certain rule. See, e. g., M.S.A. § 19.8304. Where the Code's authors were so careful in these other provisions to limit the broad meaning of the word "purchaser" to better fit a special context, it is difficult to feel that they were merely clumsy in drafting section 19.8306 and that the second subsection of this provision should read: "A person by transferring a security to a purchaser for value (other than an issuer to whom a security is transferred for registration, payment or exchange) warrants [etc.]" Yet this wording is necessary if subsections (1) and (2) are to be construed logically and if a discharging issuer is a purchaser for value.

Even apart from the question whether a discharging issuer is a purchaser or a purchaser for value, there are additional reasons why he should not be considered a bona fide purchaser. First, as mentioned above, if he were such a purchaser, he would have a substantial advantage over his counterpart, the maker of an ordinary negotiable note, when no good reason appears to justify such disparate treatment. Second, the philosophy behind the concept of a bona fide purchaser and the privileges accompanying such status grows out of a desire to facilitate transactions between strangers on the

securities markets. One presenting a security to the issuer for registration or payment or exchange is dealing with the corporation of which he owns a portion or to which he has lent money.

 In light of the above discussion, the defendants, Vernors and its agent, Manufacturers National Bank, are held not to have been bona fide purchasers of the stock warrants involved in this litigation.

 *What Rights Has Plaintiff Against A Discharging Issuer Who Is Not A Bona Fide Purchaser?*

M.S.A. § 19.8315, Comp.Laws 1948, § 440.8315 [P.A.1962, No. 174] reads:

"(1) Any person against whom the transfer of a security is wrongful for any reason, including his incapacity, may against anyone except a bona fide purchaser reclaim possession of the security or·obtain possession of any new security evidencing all or part of the same rights or have damages.

\* \* \* \* \* \*

"(3) The right to obtain or reclaim possession of a security may be specifically enforced and its transfer enjoined and the security impounded pending the litigation."

At first glance, this provision seems to cover the situation present in this case and indicates that the plaintiff is not prevented from obtaining the return of the warrants. Nevertheless, this section appears in that portion of Article 8 dealing generally with the rights of and against those who transfer securities otherwise than in transactions with issuers in connection with registration or discharge of the instruments. For example, it is clear that this provision does not apply in the case of a transfer to a corporation or its agent for the purpose of procuring registration of the security. See M.S.A. § 19.8401, et seq., Comp.Laws 1948, § 440.8401 et seq. [P.A.1962, No. 174].

Even assuming that section 19.8315 was not meant to apply in situations such as that presented in this case, a good argument still supports the view that nothing in the Uniform Commercial Code bars the relief that plaintiff seeks. Section 19.8403, Comp.Laws 1948, § 440.8403 [P.A.1962, No. 174] reads:

"An issuer to whom a security is presented for registration is under a duty to inquire into adverse claims if

(a) a written notification of an adverse claim is received at a time and in a manner which affords the issuer a reasonable opportunity to act on it prior to the issuance of a new, reissued or re-registered security and the notification identifies the claimant, the registered owner and the issue of which the security is a part and provides an address for communications directed to the claimant \* \* \*."

A look at M.S.A. § 19.3603, Comp.Laws 1948, § 440.3603 [P.A.1962, No. 174], dealing with the obligations of one discharging an ordinary negotiable instrument, may prove helpful. In part, this section provides:

"The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument unless prior to such payment or satisfaction the person making the claim either supplies indemnity deemed adequate by the party seeking the discharge or enjoins payment or satisfaction by the order of a court of competent jurisdiction in an action in which the adverse claimant and the holder are parties."

 From these two provisions it appears that were the warrants in question issued in registered form and had they been presented for registration and had the plaintiff filed suit before the process of registration had been completed, plaintiff could prevent the issuer from proceeding; furthermore, were they ordinary negotiable notes which had been presented for payment under circum-

stances similar to those present in this case, plaintiff would be able to enjoin that part of the payment not already made.

The philosophy behind these two sections seems to be that a discharging obligor who acts in good faith need not look for reasons why he should not pay off an instrument or register it, but if a claim on the instrument is brought to his attention at a time when he can prevent an injustice from occurring by paying the wrong party or registering a security in the name of a person not entitled to registration, he must do so. For example, the policy behind these sections would clearly dictate that the remaining liquidating dividends be paid to an adverse claimant were the issue in this case only a question of defendant's having paid the first installment of the amount due in liquidation to the wrong person.

Here, of course, the actual issue is not one of payment to the wrong party; it is rather a contention that, had there not been a mistake, payment would not have been made at all. Since the Code is just not clear regarding the rights of the parties in this type of case, the result can only be based on an educated guess of what the draftsmen would have provided had they foreseen the situation now before the Court. At least it appears from the foregoing discussion that an order requiring the return of the warrants would not necessarily do violence to the concept of negotiability espoused by the draftsmen in Article 8 nor to the national uniformity which they sought to achieve regarding the law applicable to investment securities. More importantly, the discussion suggests that, assuming that the relief sought is otherwise proper, an order requiring the return of the warrants would be in keeping with the spirit of the Code.

Thus far it has been shown only that nothing in the Uniform Commercial Code prevents this Court from considering further the plaintiff's claim. In all situations in which a person is permitted under Article 8 to assert an interest in a transferred security, it appears that in order to be successful his interest must be an "adverse claim." See M.S.A. § 19.8403; compare M.S.A. § 19.8315 with M.S.A. § 19.8301. M.S.A. § 19.8301 provides the only definition of this term:

> " 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security."

From this language it seems plain that were the persons for whose benefit plaintiff was allegedly holding the warrants in question the plaintiffs in this suit, their contention that the instruments were transferred without authority would constitute an "adverse claim." While it is not as clear that plaintiff's alleged right to rescission of the transaction meets the definition of an "adverse claim," it is equally unclear that it does not. The term "wrongful" in the quoted definition seems broad enough to include the concept upon which plaintiff relies: that the transfer was tainted by mistake. Furthermore, the authors' use of the word "include" in defining an "adverse claim" suggests that the remaining portion of the definition was not intended to be all inclusive.

The most difficult question involved in this case is plaintiff's common law right to rescission, assuming that it can establish that they were delivered under a mistaken impression regarding its authorization to accept on behalf of its customers the first installment of Vernors' liquidating dividend in lieu of shares of stock. Plaintiff's authorities on this point are not persuasive; for the cases it cites deal most directly with the law relative to the effect of a mistake which led a party to engage in a transaction which resulted in something other than an agreement supported by consideration. In this regard, these authorities appear to present factual situations which differ from that in the instant case.

Nevertheless, plaintiff has maintained that, if given the opportunity, it can establish that Vernors had good

reason to suspect that plaintiff's agent was acting under a mistaken impression regarding the extent of plaintiff's authority when he caused the warrants to be delivered to Vernors' liquidating agent. Judging from the quotations from various authorities set out in Vernors' brief, defendants are prepared to admit that under these circumstances, rescission would be in order. And so it would. 17A C.J.S. Contracts § 418(2); cf. Windham v. Morris, 370 Mich. 188, 121 N.W.2d 479 (1963). Plaintiff has brought to the Court's attention in the form of a copy of a telegram sent to Vernors by the alleged owners of the warrants in question some evidence suggesting that it may be able to show that Vernors did suspect that plaintiff was acting under a mistaken impression.

Furthermore, there is authority, albeit of some vintage, suggesting that plaintiff could prevail on the basis of a unilateral mistake even if Vernors had no reason to suspect its existence. See Kutsche v. Ford, 222 Mich. 442, 192 N.W. 714 (1923).

Vernors' contention that it will be subject to a stockholder's suit if the warrants are returned is about as unappealing as an argument can get. The very existence of a stockholder's right of action is premised upon the notion that there is some sort of fiduciary duty owed to stockholders by their corporations. It would seem that, in the absence of compelling authority to the contrary, one in such a fiduciary status should have less than the average right to take advantage of a mistake affecting the beneficiary of the fiduciary obligation. This would be particularly true where the advantage is sought to be utilized to prevent the beneficiary from testing the quality of the exercise of that very duty.

Likewise, Vernors' contention that it may lose the benefit of section 337 of the Internal Revenue Code, which, in general, permits a corporation to recognize no gain on the sale of its assets if they are sold pursuant to a plan of complete liquidation carried out within one year, is unconvincing. If the warrant holders claim merely that they are entitled to a larger liquidating dividend, any increased amount which may eventually be decreed payable can be provided in such a way that Vernors will still be able to take advantage of section 337. See Rev.Rul. 65–257. Even if the warrant holders should seek to set aside the proposed liquidation in its entirety, it is difficult to believe that if they can introduce no meritorious grounds on their behalf, Vernors cannot settle the matter within the period remaining before June, 1967, the anniversary of the adoption of the plan of liquidation, when Vernors admittedly has already successfully defeated two stockholder attacks in the state court in the short period of two months.

## CONCLUSION

If the warrants in question are destroyed or cancelled, the rights of the alleged owners could be irreparably injured. As noted above, there are serious questions of law and fact, not yet adequately explored by the parties or the Court, which make "a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (CA 2, 1953). (These may even increase in number if the purported owners of the warrants carry out their already expressed intention of intervening; but this factor, of course, cannot be persuasive in determining the present question which deals with the propriety of issuing a preliminary injunction on behalf of the plaintiff already in the case.) Under these circumstances, where the equities weigh in favor of plaintiff—or at least in favor of the alleged owners of the warrants for whose interests this Court cannot be totally unconcerned—and where some portion of a confusing mass of authorities unquestionably supports plaintiff's position even if it can prove no more than that it acted under a mistake of fact, this Court feels justified in granting the preliminary injunction sought. Briggs Mfg. Co. v. Crane Co.,

185 F.Supp. 177 (E.D.Mich.), aff'd, 280 F.2d 747 (CA 6, 1960).

The motion to dismiss is denied and the petition for a preliminary injunction is granted.