JAMES C. HILL, Circuit Judge:
 

 Irving Trust Company (“Irving Trust”) appeals a district court order affirming the bankruptcy court’s grant of summary judgment in favor of Plano Savings & Loan Association (“Plano”). Both the district court and the bankruptcy court determined that Plano held a superior claim to the disputed proceeds of the sale of a Government National Mortgage Association (“GNMA”) certificate. On appeal, Irving Trust maintains that it is entitled to the proceeds as the bona fide purchaser of the security from the bankrupt, Legel, Braswell Government Securities Corporation (“Le-gel”). We affirm.
 

 In September 1978, Plano entered into an agreement with Legel to purchase one million dollars worth of GNMA securities. The purchase was to be made on or before September 20, 1979, at the option of Legel. As consideration for its obligation, Plano was to receive a $5,000 commitment fee.
 
 [1]
 
 To secure Plano’s obligation to Legel, Plano pledged GNMA Certificate No. 267589SF, which had a face value of $300,000. Legel also requested that the security be transferred from the Republic National Bank of Dallas, where it was being held for Plano, to a depository chosen by Legel. This delivery was to perfect Legel’s security interest in the GNMA Certificate.
 

 The depository of Legel’s choice was Irving Trust, Legel’s clearing agent and lender. Under a Dealer Clearance Agreement, Irving Trust acted as Legel’s dealer clearance agent with respect to government securities. Pursuant to Legel’s instructions, Irving Trust received and delivered securities and made payments and collections on behalf of Legel. Each transaction created either a debit or a credit in Legel’s account depending on whether it was a purchase or sale. If, at the end of a day, the account showed a debit balance, Irving Trust would extend loan credit for that amount. To secure its indebtedness, Legel also maintained a General Collateral Agreement with Irving. Under this agreement, Legel granted to Irving a security interest in all of Legel’s property and securities in Irving’s possession. Irving Trust also was granted the power of a secured party to dispose of any portion of the collateral security to satisfy Legel’s obligation.
 

 On September 28,1978, Republic National Bank’s securities courier delivered the pledged GNMA Certificate and certain attachments to Irving Trust. Among the delivered documents was a transmittal letter containing the following instructions:
 

 Sent to you for the A/C Legel Braswall [sic] Government Securities Corp. a/c 08-116-727 to be held on deposit for Plano Savings & Loan Association.
 

 At the time of delivery, the certificate was registered in Plano’s name.
 

 Shortly after delivery of the certificate, a representative of Legel requested Plano to execute a Special Form of Detached Assignment for United States Registered Securities. This form, also known as PD 1832, is published by the Department of Treasury, and, when duly executed by the registered owner, renders GNMA securities negotiable. As requested, Plano Executive Vice President, Charles L. Cox, executed the PD 1832. The form states in part:
 

 For value received, I [Plano] assign to Legel, Braswell Government Securities Corp.... the following described registered securities of which I am (we are) the owner(s) or the duly authorized representative of the owner: [description of the security].
 

 In executing the PD 1832, however, Cox deleted one phrase from the form. The deleted phrase reads: “and hereby authorize^) discharge of registration thereof on the books of the treasury department.”
 

 
 *509
 
 In October 1978, Irving Trust delivered the certificate and assignment (PD 1832) to Chemical Bank for re-registration. Chemical re-registered the certificate to the order of Legel, and Irving Trust placed the new GNMA Certificate No. 431205F in Legel’s general dealer account. Thereafter, all payments of principal and interest were made directly to Legel.
 

 On or about January 8,1979, Legel filed a petition for bankruptcy under Chapter XI of the Bankruptcy Act. A receiver was duly appointed. Pursuant to an order of the bankruptcy court, on January 23, 1979, Irving Trust sold GNMA Certificate No. 431205F for $118,136.54 and retained the proceeds pending further proceedings. On April 9, Plano instituted Adversary Proceeding No. 9 to recover the proceeds. Le-gel, the receiver, and Irving Trust were named as defendants. Irving Trust raised an affirmative defense, alleging the rights of a bona fide purchaser. Irving Trust also counterclaimed, asking that the proceeds be applied to Legel’s outstanding obligation to Irving. Both parties moved for summary judgment, and, on January 29, 1980, the bankruptcy court entered summary judgment for Plano, denying Irving Trust’s cross-motion. That order was affirmed by the district court on April 10, 1980.
 

 The principal issue on appeal is whether Irving Trust may claim the disputed proceeds as a bona fide purchaser of the security. Because a GNMA certificate is considered an “investment security,” our determination is governed by Article VIII of the Uniform Commercial Code. See,
 
 e.g., In re Legel, Braswell Government Securities Corp.: Irving Trust Co. v. Westchester County Savings & Loan Association,
 
 648 F.2d 321 (5th Cir.1981)
 
 (“Legel Braswell
 
 JP');
 
 [2]
 

 First National Bank of Chicago v. Jefferson Mortgage Co.,
 
 576 F.2d 479 (3d Cir.1978);
 
 Lehman Government Securities Inc. v. Commercial Mortgage Co.
 
 16 U.C.C. Rep.Serv. (Callahan) 1117 (N.Y.Sup.Ct.1975). Furthermore, because the operative transactions leading to this proceeding occurred in New York, and the collateral was located in New York when the security interest allegedly was perfected, Irving Trust’s status as a bona fide purchaser is to be determined under New York’s version of Article VIII.
 
 See
 
 U.C.C. § 9-103(l)(b);
 
 Legel Braswell I,
 
 648 F.2d at 326 n. 9.
 

 As a “purchaser” of the GNMA certificate from Legel, Irving Trust’s rights are set forth in section 8-301 which provides that, upon delivery, a transferee acquires only the rights of the transferor and those rights the transferor is authorized to convey. If, however, the transferee is a bona fide purchaser as defined in section 8-302, then he may acquire the security free from any adverse claims. N.Y.U.C.C. § 8-301 (Consol.1964).
 
 [3]
 
 Section 8-302 defines a bona fide purchaser as “a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him in blank.”
 
 Id.
 
 § 8-302.
 

 
 *510
 
 The parties do not dispute that under the collateral security agreement between Le-gel and Irving Trust, Irving gave value for the GNMA certificate in the form of loans.
 
 Id.
 
 § 1-201(44) (defining “value”). What is at issue is whether Irving had notice of Plano’s adverse claim to the security and whether Irving took the certificate in good faith. Initially, however, Irving Trust challenges the definition of the relevant adverse claim used by the district court and the bankruptcy court. Irving maintains that both courts misperceived the issue by framing it in terms of whether Irving had notice of Plano’s ownership interest. According to Irving, however, because brokers may repledge their customer’s securities,
 
 [4]
 
 Plano’s ownership had no bearing on Le-gel’s ability to transfer the security to Irving Trust. Thus, Irving urges that we consider only whether Irving had notice that Legel acted wrongfully in repledging Plano’s security.
 

 The U.C.C. is rather clear on this point. Séction 8-301(1) states that an “ ‘[ajdverse claim’ includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.” Although an adverse claim is not restricted to an adverse ownership interest, see
 
 E.F. Hutton & Co. v. Manufacturers National Bank,
 
 259 F.Supp. 513, 521 (E.D.Mich.1966), neither is it exclusive of an adverse ownership interest. To attain the status of a bona fide purchaser, Irving Trust must have taken the security “without notice of
 
 any
 
 adverse claim.” N.Y.U.C.C. § 8-302 (Consol.1964) (emphasis supplied). Yet even if we were to accept that Plano’s ownership was unrelated to Legel’s ability to repledge properly, knowledge of the ownership interest nevertheless may be relevant to the determination whether Irving Trust had notice of the wrongfulness of Legel’s repledge.
 
 See Id.
 
 § 8-304(2).
 

 Section 8-304 delineates when Irving Trust may be deemed to have notice of adverse claim:
 

 (1) A purchaser (including a broker for the seller or buyer but excluding an intermediary bank) of a security is charged with notice of adverse claims if
 

 (a) the security whether in bearer or registered form has been indorsed “for collection” or “for surrender” or for some other purpose not involving transfer; or
 

 (b) the security is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor. The mere writing of a name on a security is not such a statement.
 

 (2) The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims. If, however, the purchaser (excluding an intermediary bank) has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims.
 

 (3) Except as provided in this section, to constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or a defense or knowledge of such facts that his action in taking the security amounts to bad faith.
 

 Id.
 
 at § 8-304. Under this provision, subsections 8-304(1) and (2) indicate when a purchaser may be deemed to have constructive knowledge of an adverse claim. Initially, Plano maintains that section 8-304(l)(a) applies because the security had been indorsed “for some other purpose not
 
 *511
 
 involving transfer.” Plano argues that the re-registration restriction on its PD 1832 put Irving Trust on notice of an adverse claim as a matter of law. The fault in this analysis, however, is Plano’s failure to distinguish between transfer and registration. A'transfer is a change of legal title that, in some instances, may be reflected on the books of the issuer by registration.
 
 See Id.
 
 §§ 8-314, 8-316, 8-401. However, a certificate can be transferred without re-registration.
 
 See Legel, Braswell I,
 
 648 F.2d 325 n. 7. This is precisely what Plano sought to accomplish. Plano wanted to assign the certificate to Legel to secure its obligation while retaining registered ownership. The registration restriction, therefore, did not amount to constructive notice of the adverse claim in and of itself because the restriction was not inconsistent with transfer. Similarly, unavailing is any allegation of constructive notice under section 8-304(l)(b) because that provision applies only to securities in bearer form.
 

 Plano therefore turns to section 8-304(2), arguing that Irving Trust had constructive notice of an adverse claim because Irving had knowledge that the transaction was for the individual benefit of Legel. Indeed, in an affidavit in support of Irving Trust’s summary judgment motion, an officer of Irving Trust stated:
 

 I might only state that Irving Trust requested the assignment [PD 1832] separate from certificate from Debtor [Legel] which made the original Certificate delivered to Irving Trust, Certificate No. 267589SF negotiable and then re-registered the Certificate in order that said certificate be included in Debtor’s dealer clearance account and thus subject to Irving Trust’s security interest.
 

 Record, at 128-29.
 

 Subsection (2) would allow Irving Trust to accept the certificate registered in Plano’s name without inquiring into the nature of the relationship between Legel and Plano. If, however, Irving Trust had knowledge as to the intended improper use of the certificate then Irving would be charged with notice of the adverse claim. Clearly, Irving Trust had actual knowledge that the GNMA certificate was to be used to secure Legel’s outstanding obligation. This alone, however, fails to indicate that Irving Trust was aware of the nature and terms of the relationship between Legel and Plano.
 
 See
 
 N.Y.U.C.C. § 8-304, Practice Commentary. Moreover, Plano does not allege that Irving Trust possessed actual knowledge that the repledge was improper or in breach of a fiduciary relationship between Legel and Plano, as required under this subsection.
 

 Plano’s most persuasive argument is that Irving Trust had knowledge of such facts that its action in taking the certificate amounted to bad faith. This would constitute notice within the meaning of subsection (3) of section 8-304. Before analyzing Plano’s contentions under subsection (3), however, a brief discussion of the unique aspects of New York law is in order. Subsection (3) is a non-uniform provision added to the New York statute.
 
 [5]
 
 The significance of this addition is that it “may be construed to modify the otherwise applicable rules of U.C.C. § 1-201(25)” defining “notice.”
 
 Id.
 
 § 8-302, Practice Commentary.
 
 [6]
 
 Thus, un
 
 *512
 
 der this subsection, “in order to charge a purchaser of investment securities with notice of adverse claims it is necessary to prove knowledge of such facts that the purchaser’s taking of the security amounts to bad faith.”
 
 Legel, Braswell I,
 
 648 F.2d at 327. Moreover, “New York law is that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith.”
 
 Gutekunst v. Continental Insurance Co.,
 
 486 F.2d 194, 195 — 96 (2d Cir.1973);
 
 see also United States Fidelity & Guaranty Co. v. Royal National Bank,
 
 545 F.2d 1330, 1333 (2d Cir.1976). From this analysis, it is apparent that, under New York law, the concepts of notice and good faith are interrelated in the assessment of bona fide purchaser status.
 
 See, e.g., Chemical Bank v. Haskell,
 
 51 N.Y.2d 85,432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980) (recently applying this analysis in the context of a bona fide purchaser claim under a similar provision in U.C.C. Article III). Bearing in mind this interdependence and the potential impact of this non-uniform provision, we turn to the facts at hand.
 

 Whether Irving Trust took the security under circumstances suggesting bad faith and notice of adverse claims is a factual question to be determined by examining all the circumstances surrounding the transactions.
 
 Legel, Braswell I,
 
 648 F.2d at 327;
 
 Matthysse v. Securities Processing Services, Inc.,
 
 444 F.Supp. 1009, 1021 (S.D.N.Y.1977);
 
 United States Fidelity & Casualty Co. v. Goetz,
 
 285 N.Y. 74, 78, 32 N.E.2d 798, 800 (1941). Although the documents involved in the transactions are highly probative, we do not view them in a vacuum. Plano urges that the transmittal letter delivered directly to Irving Trust by Plano’s agent, gave notice of Plano’s intention to retain an ownership interest in the certificate. Indeed, the letter did state that the security was to be held on Plano’s behalf. Irving Trust also was well aware that the security was not negotiable and not subject to its lien because of the absence of the PD 1832. It was Irving Trust who informed Legel that the certificate could not be pledged without the proper form. Thus, Irving had actual knowledge that the sole purpose of the PD 1832 was to render the certificate negotiable and to secure Legel’s outstanding indebtedness.
 

 At the request of Irving, Legel approached Plano, requesting the PD 1832 as a “mere formality.” Wishing to complete the transaction by perfecting a security interest in favor of Legel, but nevertheless wishing to retain some semblance of ownership, Plano executed the form, striking out the provision authorizing re-registration. Plano also did not execute the PD 1832 in blank; rather the form was specifically indorsed to Legel. Notwithstanding the deleted registration authorization, Irving Trust presented the certificate and the expurgated PD 1832 to Chemical Bank for re-registration. At the very least, Irving had actual knowledge that it was attempting to re-register the security contrary to the restriction contemplated by the registered owner. That Irving successfully accomplished re-registration is of no consequence.
 

 Based upon the totality of the circumstances, we conclude that Irving Trust’s disregard for suspicious circumstances, of which it had actual knowledge, constituted a taking in bad faith.
 
 See Otten v. Maras-
 
 
 *513
 
 co, 235 F.Supp. 794 (S.D.N.Y.1964), aff’d 353 F.2d 563 (2d Cir.1965). In reaching this conclusion, it is clear that Irving Trust’s status as a commercial bank is a factor to be considered. N.Y.U.C.C. § 8-304, Practice Commentary
 
 (supra,
 
 note 5);
 
 see United States Fidelity & Guaranty Co. v. Royal National Bank,
 
 545 F.2d at 1333 (citing
 
 United States Fidelity & Guaranty Go. v. Goetz,
 
 285 N.Y. 74, 32 N.E.2d 798 (1941).). As a dealer clearance agent, Irving Trust’s suspicions were certainly aroused when it requested Legel to obtain a PD 1832. Similarly, Irving’s suspicions must have been aroused by the deletion on the PD 1832. As the bankruptcy court concluded, Irving’s direct contact with Plano also indicates, that “[t]he true facts could have been learned easily and quickly a simply expedient of a telephone call to Plano.” Instead, Irving disregarded what it knew and proceeded to re-register the GNMA certificate.
 
 [7]
 

 Notwithstanding this analysis, Irving Trust urges us to find bona fide status on the basis of
 
 Legel, Braswell I,
 
 another proceeding arising out of Legel’s bankruptcy in which Irving was held to be a bona fide purchaser pursuant to the same collateral agreement with Legel. Instead, we find further support for our conclusion by contrasting Irving’s current claim with its claim in the earlier proceeding. In
 
 Legel, Braswell I,
 
 Westchester County Savings & Loan agreed to transfer certain GNMA certificates to Legel as collateral in a repurchase agreement. 648 F.2d at 324. The securities subsequently were delivered to Irving Trust by the agent of a third party, Thomas McKinnon Securities. Each certificate was registered in Westchester’s name and was accompanied by a PD 1832 form executed in blank. The delivery instructions indicated to Irving that Legel had purchased the securities from McKinnon and that they were to be processed through Legel’s dealer clearance account. Delivery tickets also were stamped on behalf of McKinnon and indicated that the name of the registered owner should not be changed.
 
 Id.
 
 at 325. On these facts, the former Fifth Circuit held Irving Trust to be bona fide purchaser.
 

 Key to the court’s decision was the fact that “[t]he certificates were pledged by Westchester to Braswell without restriction, and Westchester’s delivery to Braswell of the certificates accompanied by stock powers indorsed in blank rendered the securities freely negotiable. U.C.C. §§ 8-301, 8-308(3).”
 
 Id.
 
 at 327 (footnote omitted). Also significant was Irving Trust’s ignorance of Westchester’s role in the transfer. The delivery instructions indicated only that Westchester was the registered owner. However, the unaltered PD 1832 forms rendered the certificates bearer paper and negated Westchester’s ownership interest. For all Irving knew, the transaction involved only McKinnon. In fact, Legel not only represented to Irving that Legel had purchased the securities from McKinnon, but it also was McKinnon’s agent who delivered the documents to Irving.
 
 Id.
 
 at 325.
 

 In marked contrast are the facts of the present dispute. Irving Trust did not receive Plano’s GNMA certificate from an unrelated third party; rather, Irving took direct delivery from Plano’s agent with a transmittal letter indicating Plano’s continued ownership interest. The subsequent PD 1832 also was not indorsed in blank; rather, it was restrictively indorsed to Legel with registration authorization carefully deleted from the form. Finally, although there was an instruction not to re-register Westchester’s securities in
 
 Legel, Braswell I,
 
 there is nothing to indicate that Irving acted contrary to that instruction as was done in the present case.
 

 In rejecting Irving Trust’s claim of bona fide status, however, we do not suggest that the delivery instructions in this case plus the altered PD 1832 always will give notice of an adverse claim. Nor does our holding stand for the proposition that a GNMA certificate with an altered PD 1832
 
 *514
 
 may never be re-registered. We simply hold that on the basis of
 
 all
 
 the facts surrounding this series of transactions, Irving Trust’s knowledge of suspicious circumstances and disregard of those circumstances constituted a taking and re-registering of the security in bad faith.
 

 Irving argues in the alternative that the question of its good faith and knowledge raise material issues of fact inappropriate for summary disposition. We disagree. The intertwined issues of notice and good faith are subject to summary judgment if no genuine issues of material fact remain. Fed.R.Civ.P. 56;
 
 e.g., Legel, Braswell I, supra.
 
 The facts which lead us to conclude that Irving Trust disregarded actual knowledge of suspicious circumstances are not disputed. Irving does not deny its receipt of the transmittal letter, or receipt of the altered PD 1832. Irving Trust admits it requested a PD 1832 and that it knew why the form was requested. Irving further concedes that it had direct dealings with both Plano and Legel. And finally Irving does not deny that it re-registered the security despite Plano’s deletion of authorization. Other relevant facts supporting summary judgment are found in the documents themselves, the validity of which are not questioned.
 

 Finally, Irving Trust argues that Plano should be estopped from claiming an interest in the certificate because of laches. This, Irving maintains, also is an issue of fact improperly decided on a summary judgment motion. The alleged controversy centers on Plano’s failure to object to reregistration of the certificate until Legel’s bankruptcy proceedings had commenced. Plano maintains that no objection was made because it was unaware of the re-registration. The bankruptcy court concluded,
 

 Plano was never aware of the re-registration of the G.N.M.A. certificate in the Bankrupt’s name and did not understand or intend the PD 1832 to authorize re-registration; the Bankrupt told Plano that the execution of the PD 1832 was a mere formality.
 

 Record at 164.
 

 Irving’s argument that the finding of the bankruptcy court raises a material issue of fact focuses on the intent of Plano. Specifically Irving Trust points to the following statement in Plano’s appellate brief:
 

 Payments of principal and interest on the GNMA certificate were made directly to Legel, Braswell, which had agreed with Plano to receive such payments and remit them to Plano.
 

 Appellee’s Brief at 7. Irving argues that because Legel would not receive the principal and interest if the certificate were not registered in its name, Plano must have intended reregistration and must be es-topped from raising its objection.
 

 Irving’s contention, however, is insufficient to overturn the bankruptcy court’s finding that Plano simply did not understand the effect of the PD 1832. The facially inconsistent statement in Plano’s brief simply illustrates that Plano intended to retain the benefits of registered ownership and was unaware of the effect of the PD 1832. Indeed one Plano officer indicated in his deposition that Legel previously had collected principal and interest on other securities without re-registration.
 
 [8]
 
 We therefore find no material issue of fact with respect to the question of whether Plano intended to retain some ownership interest in the security.
 

 With respect to Plano’s delay in objecting to re-registration and the fact that it was not receiving principal and interest payments, we conclude that Plano’s ownership claim is not barred by laches. The basis of a laches defense is that a plaintiff has inexcusably and unreasonably delayed bringing its claim so as to prejudice
 
 *515
 
 the defendant substantially.
 
 Salmon v. Flacke,
 
 113 Misc.2d 640, 449 N.Y.S.2d 610 (Sup.Ct.1982);
 
 Prouty v. Drake,
 
 18 Misc.2d 887, 182 N.Y.S.2d 271 (Sup.Ct.1959). Initially, Plano’s claim was not unreasonably delayed. The depositions indicate that when Plano did not receive its October payment it began an internal investigation throughout November and December. Le-gel declared bankruptcy in January. But in any event, Irving Trust failed to allege any substantial prejudice to its position as a result of the delay. The district court therefore correctly rejected Irving’s defense of laches. For the above reasons, we
 

 AFFIRM.
 

 [1]
 

 . This commitment fee never was received by Plano.
 

 [2]
 

 .
 
 Legel, Braswell I
 
 was an appeal of another adversary proceeding arising out of Legel’s petition for bankruptcy. The dispute centered on the same collateral agreement between Legel and Irving Trust that is the focus of the present case. The court concluded that the collateral agreement failed to constitute bad faith on the part of
 
 Irving Trust,
 
 648 F.2d at 626 n. 8, and Irving Trust was held to be a bona fide purchaser with respect to other securities in Le-gel’s account at the time of Legel’s bankruptcy. A summary judgment therefore was affirmed in favor of Irving Trust.
 
 Id.
 
 at 330. See
 
 infra
 
 for a more detailed discussion of
 
 Legel Bras-well I.
 

 [3]
 

 . Section 8-301 provides:
 

 (1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. “Adverse claim” includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.
 

 (2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.
 

 (3) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.
 

 [4]
 

 . Irving Trust argues that it is not unusual for a broker to repledge its customer’s securities for the purpose of securing margin transactions.
 
 See, e.g., Fisher v. Clark,
 
 3 F.2d 621, 622 (S.D.N.Y.1924),
 
 rev’d on other grounds,
 
 8 F.2d 588 (2d Cir.),
 
 cert. denied,
 
 269 U.S. 570, 46 S.Ct. 26, 70 L.Ed. 417 (1925);
 
 In re Toole,
 
 274 F. 337, 340 (2d Cir.1921). We simply note that these rights are significantly restricted under the hy-pothecation rules of the Securities and Exchange Commission.
 
 See
 
 17 C.F.R. § 240.8c-1 (1982).
 

 [5]
 

 . The Practice Commentary to section 8-304 explains:
 

 Subsec. (3) of this section attempts to preserve in all areas other than those specifically covered by subsecs. (1) and (2) of this section the rule of the Negotiable Instruments Law under which to charge a purchaser with notice of adverse claims it was necessary to prove “knowledge of such facts that his taking the instrument amounts to bad faith.” Note the cases cited in the Official Comment to this section, several of which, decided in New York, appear to impose a somewhat higher standard of “good faith” upon a “pro-
 

 fessional” purchaser, e.g., a bank or broker.
 
 Against this background, the extent, if any, to which decisions under this section will vary from those in other states is problematical.
 
 (emphasis supplied).
 

 [6]
 

 . In the absence of New York’s section 8-304(3) the analysis would begin with section 8-302’s definition of bona fide purchaser as one who takes without “notice” of any adverse claims. We would then refer to the section 1-201(25) which provides:
 

 A person has “notice” of a fact when (a) he has actual knowledge of it; or
 

 
 *512
 
 (b) he has received a notice or notification of it; or
 

 (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.
 

 A person “knows” or has “knowledge” of a fact when he has actual knowledge of it. “Discover” or “learn” or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act.
 

 This appears to provide a less stringent standard of “reason to know” than New York’s requirement that the purchaser have knowledge of such facts that his taking the security amounts to bad faith. However, as the New York Practice Commentary,
 
 supra
 
 note 5, indicates, because a higher standard of good faith is imposed upon
 
 inter alia
 
 banks, it is problematic whether results will differ under the two standards.
 

 [7]
 

 . We doubt that Irving Trust would have exhibited similar disregard of the suspicious circumstances if it were about to warrant good title of the GNMA certificate to a bona fide third party purchaser.
 

 [8]
 

 . Irving Trust alleges that it would be impossible for Legel to make principal and interest collections on securities registered in Plano’s name, but offers no proof to that effect. For graduated payments on mortgage back securities, payments are made to holders of the securities and not necessarily registered owners. See
 
 generally
 
 24 C.F.R. § 390.40-47 (1982). With the proper indorsement, Legel conceivably could make such collections and remit the proceeds to Plano.
 
 Cf.
 
 U.C.C. § 1-201(20) (defining “holder”).