**In re LION CAPITAL GROUP, et al., Debtors.**

**Bankruptcy Nos. 84 B–L0668—84 B–L0672 (HCB).**

United States Bankruptcy Court, S.D. New York.

April 25, 1985.

Weil, Gotshal & Manges, New York City, for Bradford Trust Co.; Richard Krasnow, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for the Chapter 11 trustee; Milton Sherman, Arthur Steinberg, and Jo Davis, New York City, of counsel.

Anderson, Russell, Kill & Olick, New York City, for The School Dist. and Municipalities Creditors Committee and Sweet Home Central School Dist., County of Putnam, Bethlehem Central Schools, Redevelopment Agency of the City of Morgan Hill, Town of Rumford, Me., Greenburgh Central School Dist., Guilderland Central School Dist., Homer Central School Dist., Sayville Union Free School Dist., Akron Central School Dist., North Tonawanda City School Dist., Amityville Union Free School Dist., Byram Hills Central School Dist., Duval County School Bd., Seaford Union Free School Dist., Pioneer Central School Dist., Sherbourne-Earlville Schools, Kodiak Island Borough, San Jose Redevelopment Agency, Port Byron Central School Dist., Amherst Central School Dist., County of Saratoga, Baldwinsville Central School Dist., The Roman Catholic Diocese of Rockville Center, Alexander Central School Dist., Altmar Parish, Williamstown Central School Dist., Village of Fairport, Clyde Savannah Central School Dist., Geneva Central School Dist., Greater Amsterdam Central School Dist., Lancaster Central School Dist., Village of Monroe, N.Y., and Regional Transp. Program, Inc. of Portland, Me.; James P. Heffernan, and Tina L. Brozman, New York City, of counsel.

Schwartz, Klink & Schreiber, New York City, for People's Nat. Bank of N.J., William C. Viets, New York City, of counsel.

Debevoise & Plimpton, New York City, for Alden School Dist., East Aurora School Dist., Frontier School Dist., Kenmore School Dist., Lake Shore School Dist., Town of West Seneca and The Hanover Trust Co. of Pa., Andrew C. Hartzell, Jr., Steven Klugman, and Arthur H. Amron, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for Brewster Central School Dist., Canajoharie Central School Dist., Chappaqua Central School Dist., Dobbs Ferry Union Free School Dist., Gloversville Central School Dist., City of Kingston, Lakeland Central School Dist., Ossining Union Free School Dist., Pawling Central School Dist., Putnam Westchester B.O. C.E.S., Westchester B.O.C.E.S., Town of New Gloucester, Me., Roosevelt School Dist.; Louis Scarcella, and Jeffrey Heller, New York City, of counsel.

Wiles, Fahey & Lynch, Syracuse, N.Y., for The Village of Solvay; Thomas Lynch, Syracuse, N.Y., of counsel.

Allan S. Moller, Elmsford, N.Y., Town Atty., Town of Greenburgh; Peter Cella, Elmsford, N.Y., of counsel.

O'Hara, Felice & Crough, Syracuse, N.Y., for Alexandria Central School Dist., Delaware Valley Central School Dist., East Syracuse-Minoa Central School Dist., Island Park Union Free School Dist., Mt. Markham Central School Dist.; Richard T. Bruno, Syracuse, N.Y., of counsel.

Jeffrey L. Zivyak, New York City, for Smithtown School Dist.

Irwin Ploss, pro se.

Henry W. Trimble, Jr., New York City, for Andrew and Geraldine Morrison, Ralph K. Friedlander, Marguerite Filson, Irving Berzner and the G & T Trust.

## OPINION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

In this proceeding, the Trustee of the estate of Lion Capital Group ("Lion") and several of its affiliates, Lion Capital Associates, Blackburn Associates, Hamilton Gregg Asset Management Ltd. and Hamilton Gregg Monetary Management Ltd. (jointly "debtors")[1] seek an order of this Court pursuant to Rule of Bankruptcy Procedure 9019 approving a proposed settlement of an adversary proceeding commenced by Bradford Trust Company ("Bradford") against the Trustee and some thirty-seven creditors. Those creditors are primarily school districts and municipal agencies (the "Open Repo Creditors") who had entered into repurchase agreements with Lion which were open when the debtors filed petitions under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C.

§ 1101, *et seq.* (1984) (the "Bankruptcy Code"). Objections to the settlement were filed by some 42 entities (the "Closed Repo Creditors"). They are defendants in an action commenced by the Trustee on November 2, 1984 to recover for the estate certain transfers by Lion resulting from the prepetition closing of repurchase transactions. An evidentiary hearing was held regarding the Settlement on March 1, 11 and 12, 1985.

### I

When the debtors filed their petitions on May 2, 1985, Bradford Trust Company ("Bradford") held some $45 million in securities in Lion accounts consisting primarily of United States Treasury obligations. It claimed them as security for loans to Lion pursuant to an agreement styled as a "General Clearance, Draft Receivable Financing and Security Agreement" (the "Security Agreement"). Upon the joint application of the Trustee and Bradford, this Court entered an order dated May 14, 1985 empowering the Trustee to liquidate the securities and directing him to hold the proceeds in a cash account at the Federal Reserve Bank of New York (the "Federal Cash Account"). The order provided that all parties would retain the same rights in the Federal Cash Account as they had in the securities. Bradford then filed a summons and complaint seeking a determination by this Court of the validity of its lien. The Trustee and the Open Repo Creditors asserted counterclaims against Bradford and cross-claims against each other. This action and its proposed settlement involves the resolution of those various claims.

### A. *The Lion Accounts at Bradford*

From the evidence at the hearing, it appears that on June 7, 1983, Lion and Bradford entered into the Security Agreement

---

1. Lion Capital Associates and Blackburn Associates are New York limited partnerships. Along with Rollin H. Needham, they formed Lion Capital Group as a general partnership in April, 1983, with initial capital of $6.2 million. Hamilton Gregg Asset Management Ltd. is the corporate general partner of Lion Capital Associates, and Hamilton Gregg Monetary Management Ltd. is Blackburn's corporate general partner. On May 3, 1984, the United States Trustee, upon consent of the debtors, appointed Stanley T. Lesser to serve as Chapter 11 trustee of those estates.

whereby, in exchange for advances by Bradford to Lion, Bradford was granted a security interest in

> ... the balance and contents of every and all deposit(s) or account(s), now or hereafter existing, of [Lion] with BTC, any other claim of [Lion] against BTC, now or hereafter existing, and all money, instruments, securities, documents, chattel paper, general intangibles, credits, accounts, contract rights, claims, demands and any other property, rights and interests of [Lion] which at any time shall come into the possession or custody or under the control of BTC or any of BTC's agents, associates or correspondents, or in which BTC shall have any right or interest for any purpose, and shall include the proceeds, products and accessions of and to any of the foregoing ...

As contemplated by the Security Agreement, Bradford opened a government securities clearance account in Lion's name (the "Clearance Account"). In October, 1983, Lion began entering into non-possessory repurchase agreements primarily with school districts and municipalities solicited by an entity known as National Money Market Services Inc. Bradford opened three segregation accounts for Lion (the "Segregation Accounts").

Although Bradford contends that the Security Agreement embraces securities contained in the Segregation Accounts, the document does not expressly refer to accounts designed to contain securities held for Lion's customers. The great preponderance of the evidence on this record confirms that such coverage was not intended. Bradford's Standard Methods & Procedures Manual states that "[s]ecurities in segregation accounts may never be used as collateral for loans." Furthermore, each of the Account Profiles for each of Lion's three segregation accounts contains the statement that this "Account will be used solely for segregation of customers' fully-paid securities." The meaning of this is made clear by comparing the caption to the principal Segregation Account, "Lion Capital Group Customer Segregation Account" (Exh. 8a) with the Clearance Account caption, "Lion Capital Group."

The Clearance Account contained $32,562,169.67 when Lion filed its Chapter 11 petition. Approximately $1,000,000 of unpaid interest on the securities in the account had accrued, thus yielding a real value in excess of $33,500,000. Bradford, however, contends that an additional $10 million belongs in the Clearance Account. It alleges that Irving Comerchero, the Lion official directly responsible for dealings with Bradford, instructed Bradford, on or about March 5, 1985, to transfer approximately $10 million from the Segregation Accounts to the Clearance Account. According to the Trustee, Comerchero denies giving that instruction. In any event, the transfer was not consummated since the Bradford employee simultaneously completed transfer tickets both debiting and crediting a Segregation Account in that amount.

Of the three Segregation Accounts, only two contained any securities as of the filing date. The first Segregation Account contained securities of a value of $12,513,963 and the second, $468,750. According to the Trustee, these figures were subject to upward adjustment for unpaid accrued interest, so that the total value of the securities in the Segregation Accounts approximated $13 million.

### B. *Lion Repo Transactions*

A typical Lion nonpossessory repurchase transaction ("repo")[2] began, according to

---

**2.** In a repo transaction,

> [t]he 'buyer-lender' of funds agrees to buy and the 'seller-borrower' of funds agrees to sell a security at a specified price. Simultaneously, the buyer-lender agrees to sell and the seller-borrower agrees to buy the same security or its equivalent at a future day. The price differential between the two transactions represents the interest paid or earned on the transaction. The securities sold can be viewed as collateral securing the seller-borrower's repurchase obligation.

Novikoff and Julis, *Repurchase and Reverse Repurchase Agreements Under Articles 8 and 9 of the Uniform Commercial Code,* 290 P.L.I. 79, 81 (1982). A reverse repo is the same transaction

the Trustee, with Lion informing a company known as National Money Market Services Inc., of the amount of security repurchase transactions ("repos") it would be willing to transact on a particular day and at what interest rate. National Money Market apparently would then solicit clients and inform Lion later in the day of the amount of repos it was able to place.

A client, often a school district or municipal agency, would thereupon wire funds directly to Bradford or to a Bradford account at a bank such as National Westminister Bank. The wire transfers instructed Bradford to deposit the funds in Lion's account with it. Upon receipt of the wire transfer and apparently after telephonic communications with Lion, Bradford would prepare an internal memorandum reflecting the name of the client, the date, the amount and a notation that the funds were intended for the Lion Clearance Account.

For its repo transactions, Lion employed government securities, which it delivered or transferred to a custodian bank designated by the client ("possessory" repos) or which Lion informed the client were being "held in safekeeping" at Bradford ("nonpossessory" repos). For nonpossessory repos, Lion, upon learning of the wire transfer, would prepare an internal worksheet containing the preprinted notations "SEL" and "REPO". The worksheet stated the name of the client, the starting and completion dates of the repo, the type of securities involved, the amount of the principal of the repo agreement, the interest rate and the maturity date of the securities. Under the heading "SPECIAL INSTRUCTIONS", the notation ".33 NMMS" might be found, reflecting the commission to be paid to Na-

tional Money Market in connection with the transaction.

Based on that worksheet, Lion would prepare and send to the client a confirmation slip reflecting those terms but excluding the reference to National Money Market. For example, the confirmation slip of a repo transaction sent to Deer Park Union Free School District ("Deer Park"), admitted into evidence at the hearing as part of the documentation concerning a sample repo transaction, contains the Lion letterhead and reflects trade and settlement dates of December 7, 1983. The confirmation slip also indicates that Lion "SLD" $975,000 of United States Treasury bonds maturing August 15, 2013, with a twelve percent coupon dated August 15, 1983, and bearing CUSIP No. 912810DF2. Further, the slip confirms that the securities are the subject of a 42 day repurchase agreement at a rate of 9.5%.

There is no indication that Lion informed its clients of the existence of Bradford's asserted lien. The confirmation slip delivery instructions were to the contrary, stating with respect to the securities sold, "HOLD IN SAFEKEEPING AT BRADFORD TRUST CO., N.Y. WITH RIGHT OF SUBSTITUTION."

Apparently, Bradford did not generally receive a copy of the confirmation slips sent to the clients.[3] But its daily account statements for the Lion Clearance Account reflected the name of Lion's customer together with the amount deposited by the customer preceded by a minus sign. The minus sign indicated that the deposit of funds from the client was used to reduce Lion's loan balance with Bradford.

---

viewed from the standpoint of the buyer-lender (i.e., a purchase coupled with a commitment to sell). Hirschberg, *Issues which Frequently Arise in Structuring and Documenting Commercial Repurchase Transactions,* 290 P.L.I. 213, 215 (1982).

**3.** A Bradford official, John Donnelly, saw at least one confirmation slip, relating to a repo transaction between Lion and Connetquet School District. Apparently, Connetquet had requested that Lion obtain a confirmation from Bradford that the securities were held in "safe-

keeping." Comerchero sent the Lion confirmation slip over to Bradford. Donnelly asserts that after checking the various Lion accounts to see if the amounts of securities were sufficient to cover the Connetquet repo, he signed the Lion confirmation slip. It is conceded, however, that in the normal course of business, Bradford did not receive copies of the confirmation slips although Donnelly's deposition testimony suggests that Bradford may have received them occasionally.

The securities that were the subject of the Lion repo transactions ("repo securities") in issue here were book entry securities. The record does not reveal when book entries were made reflecting Bradford's having an interest in the securities, when entries were made placing them in the Clearance Account or if the securities were the subject of prior repo transactions. Presumably, some securities were placed in the Clearance Account prior to any repo transactions, others were obtained in connection with repo transactions and rolled over upon a transaction's closing and still others were obtained in connection with repo transactions that were still open when Lion filed its Chapter 11 petition. With respect to the sample transaction furnished to us, Bradford's documentation indicates that the repo ·securities came into the Clearance Account the same day that Deer Park wired funds to Bradford.

Also not at all clear is the transfer of securities between the Clearance Accounts and the Segregation Accounts. For the sample transaction, the Segregation Accounts do not reflect incoming securities on the date Deer Park wired funds to Bradford. It does, however, reflect an existing inventory of $22,985,000 in United States Treasury bonds.[4]

## C. *Prior Proceedings and the Claims Asserted*

By summons and complaint dated May 30, 1984, Bradford sought, pursuant to § 506 of the Bankruptcy Code and Rule of

Bankruptcy Procedure 7001(2), to determine the validity, priority and extent of its lien and security interest in the Federal Cash Account.[5] Its amended complaint alleged that Bradford was owed $44,834,-953.31 pursuant to the Security Agreement, representing unpaid loans, accrued pre-petition interest and service fees up to May 2, 1984, and sought post-petition interest accruing at the rate of approximately $14,000 per day. Bradford averred that, pursuant to the Security Agreement, it had a perfected security interest in all securities of Lion that were maintained in the four Lion accounts at Bradford. It, therefore, claimed to be entitled to the Federal Cash Account, notwithstanding any interest or lien in the Federal Cash Account asserted by the Open Repo Creditors resulting from open repurchase or reverse repurchase transactions entered into with Lion allegedly in the approximate amount of $40.8 million.

In answering the complaint, both the Trustee and the Open Repo Creditors denied the validity of Bradford's lien and sought equitable subordination of Bradford's lien pursuant to § 510(c) of the Code. The Trustee also alleged that his rights in the Federal Cash Account were superior to those of Bradford and the Open Repo Creditors.

For their part, the Open Repo Creditors asserted ownership rights to the Federal Cash Account and that they had a lien which was prior in right to that of Bradford or the interest of the Trustee or, alter-

---

**4.** Documentary evidence of the Deer Park repo transaction included the daily account statement ("T/P") for the Clearance Account, which reflected a wire transfer of funds identified as coming from Deer Park, and a deposit on the same day of Treasury bills of the same character and value as the securities that were the subject of the Deer Park repo transaction. The T/P of one Segregation Account did not reflect any transaction involving Treasury bills of the same character. Documentation of the activity in the other two Segregation Accounts on that day was not, however, submitted.

**5.** By order to show cause returnable May 10, 1984 Byram Hills Central School District sought an order directing the Trustee to turn over certain United States Treasury bills that were the

subject of a pre-petition repurchase transaction ("repo") to be completed by the debtor on May 15, 1984. All parties agreed that other creditors ("repo creditors") were in the same position and that their claims should be represented on a coordinated basis. At the adjourned hearing of May 17, 1984, the repo creditors reported that they had organized, and the Trustee suggested that the legal and factual issues would most appropriately be resolved in the context of an adversary proceeding commenced by Bradford. Bradford agreed to do so by May 31, 1984. For further discussion of related orders and the expedited treatment given this matter *see In re Lion Capital Corp.,* 44 B.R. 684 (Bankr.S.D.N.Y. 1984) familiarity with which is assumed.

natively, that a constructive trust should be imposed on the Federal Cash Account. They further claimed that Bradford's purported security interest should be equitably subordinated and sought damages from Bradford for misrepresentations, nondisclosures and aiding and abetting of Lion's fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1981) and Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.10b–5 (1984).

In particularizing these claims, the Open Repo Creditors alleged that Bradford knew or should have known that school districts and municipalities were involved in open repo transactions with Lion, that it had a legal obligation to segregate the repo securities free of any lien, and that it was a fiduciary and had been portrayed as such by Lion and failed to disclose fully Lion's imminent or actual insolvency and inability to close out repo transactions on schedule. The Open Repo Creditors asserted that Bradford maintained a secret position that its lien applied to securities attributable to open repo transactions while using cash transferred by the Open Repo creditors to pay down its loan balance with Lion. They also averred that pursuant to N.Y. General Municipal Law § 11 (McKinney 1977), and N.Y. Education Law §§ 1604–a and 1723–a (McKinney Supp.1983), Bradford was charged with knowledge that school districts may only purchase government securities, and that transactions violative of those provisions are void.

Massive discovery commenced in expedited fashion to meet a discovery bar date of October 25, and trial date of November 12, 1984, but rescheduled for November 13, 1984. Depositions were taken of 81 witnesses consuming 104 lawyer days and resulting in transcripts of approximately 18,-150 pages.

The Trustee was granted leave to file an amended answer by order dated November 13, 1984. The five additional counterclaims against Bradford asserted that transfers of securities from the Segregation Accounts to the Clearance Account, the sale of those securities, and application of the proceeds to pay down Lion's indebtedness to Bradford constituted avoidable preferences and fraudulent transfers under §§ 547 and 548 of the Bankruptcy Code, notwithstanding the 45 day exception contained in § 547(c)(2) of the Bankruptcy Code. The amended answer also asserted that Bradford had improved its position in the two weeks prior to bankruptcy and that the Trustee could recover the amount of improvement under § 547(c)(5) of the Code. Trial as to those matters was postponed until after completion of the trial regarding the claims originally asserted.

### D. *The Settlement*

Just prior to the November 13, 1984 date set by this Court for trial of the adversary proceeding, the parties indicated that settlement negotiations were moving forward. The trial was adjourned. By order to show cause returnable March 1, 1984, the Trustee sought the approval of this Court of a settlement agreement by and among himself, Bradford and the Open Repo Creditors.

Notice of the hearing was given to all creditors and to those defendants to a preference action commenced by the Trustee in November 1984. The defendants to that action (the "Closed Repo Creditors"), various municipalities, school districts, and other public entities, were served with an amended complaint in December 1984. They are alleged to have engaged in repo transactions identical to those engaged in by the Open Repo Creditors claimed to be preferential in the sums of $70,224,275.82 or $24,514,102.80, depending upon the applicability of the 45 day exception provided by § 547(c)(2).

The Settlement Agreement provides for a division between Bradford and the Trustee of the Federal Cash Account, currently estimated to contain almost $50 million. Bradford would receive $34 million of the approximately $45 million deposited into the Federal Cash Account plus interest on $34 million earned during the period from November 1, 1984 through the closing

date.[6] This sum was estimated at $1,200,000 as of February 28, 1985. The Trustee would receive the balance, estimated at $15,300,000, consisting of the approximately $11,000,000 remaining from the formation of the Federal Cash Account plus all interest not credited to Bradford. In addition to that distribution, the Trustee would receive at the closing date $500,000 on account of legal fees and expenses incurred in connection with the adversary proceeding, as well as $25,000 representing the amount deposited by Lion with Bradford in connection with the opening of the Clearance Account in May, 1983.

In addition, Bradford is to furnish the Trustee with an irrevocable standby letter of credit in an amount equal to the interest paid to Bradford on its $34,000,000 distribution. If the "Limited Estate"[7] is not sufficient to permit payment of $17,500,000 to the Open Repo Creditors by September 1, 1985, the Trustee may draw down the letter of credit to the extent necessary to fund such a distribution. Bradford retains a right to reimbursement in the event the Trustee subsequently collects assets for the Limited Estate sufficient to fund aggregate distributions to the Open Repo Creditors in excess of $17,500,000 without the letter of credit. If Bradford or any of its corporate affiliates receive insurance proceeds reimbursing it for losses or expenses incurred pursuant to its dealings with Lion, the Trustee is to receive 25% of any proceeds in excess of $1.2 million.

The Settlement Agreement further provides for the allowance of Bradford's claim against the estate as a general unsecured claim for $45,834,953.31, plus the net amount, if any, drawn by the Trustee on the letter of credit, less the amounts to be paid Bradford from the Federal Cash Account pursuant to the Settlement Agreement. The Open Repo Creditors' claims, aggregating approximately $40,800,000.00, would be allowed as general unsecured claims. In addition to their allowed claims, the Open Repo Creditors would receive all distributions from the Lion estate attributable to Bradford's allowed claim until those distributions equal 90% of their allowed claims. Bradford would then receive distributions on account of its claim.

## E. The Settlement Hearing

At the hearing on the proposed settlement, some forty-two objectors to the Settlement appeared. Most of these were the Closed Repo Creditors. The objectors asserted, *inter alia*, that the settlement constitutes a *de facto* plan which attempts to circumvent the creditor protection afforded by the Bankruptcy Code. To many of them, it appears that the Settlement with Bradford is unreasonably low. The Closed Repo Creditors also assert that the Trustee is receiving nothing for his preference claims against the Open Repo Creditors and yet, in unseemly fashion, is pursuing identical claims against them. This prejudices them, they say, for if this estate includes all voidable preferences asserted against the Open Repo Creditors and the Closed Repo Creditors, the distribution to those entities would be larger than under the Settlement. To this it is added that giving the Open Repo Creditors a distribution on Bradford's claim unfairly discriminates among creditors of the same class.[8]

6. The Settlement Agreement conditioned the obligation of the parties to it on a closing occurring by the earlier of 10 days after entry of an order approving the Settlement Agreement or March 29, 1985. The reference to March 29 was subsequently amended to April 30, 1985.

7. The "Limited Estate" includes all assets of the Lion estate excluding amounts paid or reserved in respect of disputed claims and past and future administration expenses, recoveries against the limited partners of Lion Capital Associates and Blackburn Associates, and recoveries on account of fraudulent transfer or preference claims or other actions asserted against any party other than Bradford or the Open Repo Creditors.

8. In response to the request by the Closed Repo Creditors for time to investigate the relative merits of the parties' claims and to examine materials obtained pursuant to discovery, this Court directed the Trustee to make all depositions of Bradford personnel and the exhibits thereto available to the Closed Repo Creditors. The hearing was adjourned for ten days to permit examination of those materials.

Various documents were introduced in evidence at the hearing, including the Security Agreement, the account profiles, materials relating to the sample repo transaction, and the pleadings. Portions of the various depositions were designated by proponents and objectors and admitted.

In brief, the Trustee testified that in his judgment the Settlement, considered as a whole, was adequate. He added that the portion concerning the Open Repo Creditors was part of the "total package" and that they would not deal with him individually. He further observed that although he thought their claims of ownership meritless, the Open Repo Creditors insisted that he release his preference claims as part of the Settlement.

As to his claims against Bradford, the Trustee averred that he had a strong claim to the securities contained in the Segregation Accounts and that his preference claims might be weakened since Bradford may have given new value. With respect to the Trustee's assertion that Bradford's lien against the Clearance Account was invalid or should be subordinated, the documentary and deposition evidence indicated that Bradford officials knew that: (i) school districts and municipalities wired funds to Bradford for Lion accounts for repo transactions; (ii) funds wired by school districts were used to pay down Bradford's loan balance with Lion; and (iii) in at least one instance, a Bradford official saw a complete Lion confirmation slip indicating all the pertinent terms of a Lion repo transaction. Whether Bradford knew more was not wholly clarified. Asked by Bradford's counsel as to whether in the course of discovery he found any evidence of fraud on the part of Bradford's part, the Trustee paused dramatically and eventually stated, "no *tangible* evidence, no."

## II

▮ Rule 9019(a) of the Rules of Bankruptcy Procedure gives the court the power to approve a compromise or settlement:

On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other persons as the court may designate.

The factors relevant to approval have been established by case authority. Upon timely objection, the court is to consider whether a settlement is a *de facto* plan of reorganization and thus requires the procedural protections of Chapter 11 of the Bankruptcy Code. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128 (8th Cir.1984) *cert. denied, sub nom. Reavis & McGrath v. Antinore,* — U.S. —, 105 S.Ct. 1169, 84 S.Ct. 320 (1985); *c.f. In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983). Then, the court is to evaluate the proposed settlement, through examining

(a) the probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929); *In re Carla Leather,* 44 B.R. 457, 466 (S.D.N.Y.1984); *Matter of Marshall,* 33 B.R. 42, 9 C.B.C.2d 691 (Bkrtcy.D. Conn.1983). Upon the evidence adduced at the hearing, the court is not finally "to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Services Inc.),* 762 F.2d 185, 187, 189 (2nd Cir.1985), *quoting In re W.T. Grant & Co.,* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied sub nom. Cosoff v. Rodman,* — U.S. —, 104 S.Ct. 89, 78 L.Ed.2d 97 (1984).

▮ Such canvassing of the issues hardly means, as Bradford implies, that the Bankruptcy Court is not to conduct a thorough and informed analysis. *Protective*

*Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). The settling parties must set forth the facts in "sufficient detail that a reviewing court could distinguish it from 'mere boilerplate approval' of the trustee's suggestions." *In the Matter of Boston & Providence Railroad Corp.,* 673 F.2d 11, 12 (1st Cir.1982); *accord, Empire National Bank v. Frohlich (In the Matter of Black Watch Farms, Inc.),* 373 F.Supp. 711, 716 (S.D.N.Y.1974) (where the court, in reversing approval of a settlement, stated, "there were certain important aspects of the compromise about which the Referee was not sufficiently informed—at least as far as the record shows.").

This requirement of a record containing adequate information set forth in sufficient detail to enable approval of a settlement parallels the same requirement applicable to district court consideration of settlements in class and derivative actions pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure. *Carla Leather,* 44 B.R. at 466.

> "[I]n passing on the settlement of a derivative suit, as on a compromise in a proceeding under Ch. X of the Bankruptcy Act, the judge must have "apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."

*Saylor v. Lindsley,* 456 F.2d 896, (2d Cir. 1972) (Friendly, J.).

Like the district courts, *see Seigal v. Merrick,* 590 F.2d 35, 38 n. 2 (2d Cir. 1978), the bankruptcy courts have discretion. *United States v. Aweco, Inc. (In the Matter of Aweco, Inc.),* 725 F.2d 293, 297–8, *reh'g denied,* 732 F.2d 941 (5th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *In the Matter of Sapphire Steamship Lines, Inc.,* 339 F.Supp. 119, 123 (S.D.N.Y.1972). That discretion permits it, upon being presented with an adequate record, to approve a settlement above the lowest level of reasonableness. Approval at that level, however, is not required. *Cf. Seigal v. Merrick,* 590 F.2d at 38. The court in applying its discretion is not to act "... arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." *Langnes v. Greene,* 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931), quoted in *Aweco,* 725 F.2d at 298.

Here the Settlement is objected to as a *de facto* plan discriminating against the Closed Repo Creditors. There is no dispute as to difficulty of collection. No evidence suggests that Bradford will not be able to respond to a judgment on the Trustee's counterclaims. Nor is there any dispute as to the complexity of this proceeding. This is a large litigation involving huge claims. Rather, the debate here concerns the Trustee's probability of success in prevailing on his claims and the best interests of creditors. With the standards articulated above in mind, we turn to consideration of these factors.

III

To the objecting creditors, the Settlement is a *de facto* plan of reorganization that circumvents the procedural safeguards of Chapter 11 of the Bankruptcy Code and unfairly discriminates against them. In so claiming, they assert that it constitutes an allocation of the fund generated through liquidation of the government securities held in the Clearing and Segregation Accounts as of May 2, 1985, requires the parties to the Settlement to vote for a plan embodying its terms and impermissibly permits only the Open Repo Creditors to share in Bradford's unsecured $10 million claim.

There can be but little doubt that a sale of assets pursuant to § 363 of the Bankruptcy Code or a wholesale assignment of unsecured claims under Rule 3001 of the Rules of Bankruptcy Procedure may not masquerade as a plan and thereby defeat the franchise and other protections of Chapter 11. *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re*

*Braniff Airways, Inc.*), 700 F.2d 935 (5th Cir.1983); *Matter of U.S. Truck Co., Inc.,* 42 B.R. 790 (Bkrtcy.E.D.Mich.1984). But a settlement's division of a fund to which a trustee and a purportedly secured party each claim ownership can hardly be characterized as payment of a dividend requiring a plan. Rather, such a settlement, if approved, frees up assets for an estate and permits the formation of a plan of arrangement. *Flight Transportation,* 730 F.2d at 1135.

■ Similarly, a contractual provision contained in a settlement agreement that requires a secured creditor to vote for a plan consistent with the settlement should not change the substance of the transaction. A settlement differs from the situation presented in *Braniff,* where the parties sought an order pursuant to § 363(b) of the Bankruptcy .Code to sell all of the debtor's assets. There, the transaction "had the practical effect of dictating some of the terms of any future reorganization plan." *Braniff* at 940. The agreement required secured creditors "to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors committee." *Ibid.* The Fifth Circuit accordingly held that the bankruptcy court lacked power to approve the transaction under that section, observing,

> Such an action is not comprised by the term 'use, sell or lease,' [§ 363(b) ], and it thwarts the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned.

*Ibid., accord, cf. In re Lionel Corp.,* 722 F.2d 1063 (2d Cir.1983).

■ Here, however, the issue arises in connection with Rule 9019. That rule contains no express limitation, and the voting agreement does not require Bradford, or the Open Repo Creditors to vote for any plan approved by others, thereby forfeiting their franchise. Further, the only distributive effect of the Settlement would be to permit the Open Repo Creditors, under certain conditions, to share in Bradford's claim. Accordingly, the voting provision does not require the Settlement Agreement to be judged as a plan. *Flight Transportation Corp.,* 730 F.2d at 1135. The provision is far less onerous than that in *Braniff* and a trustee should hardly be faulted for insisting that the parties to a settlement be constrained from reneging on their agreement during the plan consideration process provided by the Bankruptcy Code.

Of more merit are those objections to the Trustee's assertion that the provision regarding ˙ distribution to the Open Repo Creditors with respect to the Bradford unsecured claim is merely an assignment by Bradford pursuant to Rule 3001. That characterization was effectively denied by the Trustee's testimony admitting that the Settlement does not even mention the term "assignment".

■ Nevertheless, the Settlement does not appear to be a *de facto* plan and does not appear to discriminate unfairly. From examination of the clause itself and from the evidence at the hearing, it would appear that this provision is designed to accomplish a partial equitable subordination of Bradford's claim to the claims of Open Repo Creditors. Presumably, Bradford is thereby able to settle the Open Repo Creditors' claims seeking damages for its having allegedly aided and abetted Lion's fraud and seeking subordination pursuant to § 510(c). As such, the provision would not unfairly discriminate against other creditors or provide for impermissible classification as is claimed.[9] In

---

**9.** Counsel for the Closed Repo Creditors cite *In re Iacovoni,* 2 B.R. 256 (Bankr.D.Utah 1980) and *In re Wolff,* 22 B.R. 510 (B.A.P. 9th Cir.1982) both Chapter 13 cases for the proposition that all unsecured creditors must be placed in the same class and treated the same. *Iacovoni,* however, is based on such a restrictive construction for allowing classifications that it has been criticized and rejected by most courts. *E.g., Flygare v. Boulden,* 709 F.2d 1344 (10th Cir. 1983); *Barnes v. Whelan,* 689 F.2d 193, 201 (D.C.Cir.1982); *In re Cook,* 26 B.R. 187 (Bankr. D.N.M.1982); *In re Perskin,* 9 B.R. 626 (Bankr. N.D.Tex.1981). None of these cases deny the ability to subordinate. Indeed, *Wolff* might be read as supporting subordination within a class.

view of the applicability of § 510(c) to Chapter 11 cases, moreover, subordination of one creditor to only some of the members of a class must be deemed acceptable. Such subordination is hardly unfair to other creditors. For every dollar distributed to that class, they will receive their appropriate share regardless of the subordination. All that the subordination accomplishes is priority of allocation of the remainder among the parties to the subordination.

## IV

### Probability of Success

A. *Bradford's Ability to Sustain its Lien as to Securities in its Accounts*

Although hardly indicated by the Trustee's counterclaim, at the hearing it became clear that the Trustee has at least three theories upon which to mount an attack against Bradford's lien: the lien did not embrace securities held in the segregation account, the lien should be equitably subordinated, and the lien was not acquired in good faith or without notice of adverse claims.

i. *The Securities in the Segregation Account*

 As to the first of these, it seems clear that the Trustee enjoys a high probability of success were the case to proceed to trial. In evaluating this claim, the parties have focused on the evidence of Bradford's intention that the lien not embrace the Segregation Accounts and whether or not such evidence would be admissible under New York's codified version of the parol evidence rule. N.Y. General Obligations Law § 15–301 (McKinney 1984). Even on this limited record, it would appear that there are at least two reasons why the evidence would not be barred. First, the

Here, moreover, an inclusion of Bradford within a class of general unsecured creditors would hardly violate the equal treatment provision of § 1123(a)(4) of the Bankruptcy Code, for it has consented to such treatment by agreeing to the Settlement.

reference in paragraph 4 of the Security Agreement to "the balance and contents of every and all deposit(s) or account(s), now or hereafter existing, of [Lion] with BTC" does not expressly include accounts that were established or maintained on behalf of Lion's customers. Had such coverage been sought, Bradford could have easily found appropriate language with which to express such a desire in authoring the Security Agreement. It would appear that parol evidence clarifying the ambiguity would be admissible. *FLLI Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563 (2d Cir. 1977); *Zolar Publishing Co. v. Doubleday & Co. Inc.*, 529 F.2d 663 (2d Cir.1975); *Lemelson v. Ideal Toy Corp.*, 408 F.2d 860, 864 (2d Cir.1969); *Bellefonte Re Insurance Company v. Argonant Insurance Company*, 581 F.Supp. 241 (S.D.N.Y.1984); *In re Walter Reade Organization, Inc.*, 28 B.R. 320 (Bankr.S.D.N.Y.1983).

Secondly, the old but familiar adage permitting parol evidence in cases of fraud, *e.g.*, *Cortlandt v. E.F. Hutton, Inc.*, 491 F.Supp. 1, 4 (S.D.N.Y.1979); *United States v. Wallace & Wallace Fuel Oil Co., Inc.*, 540 F.Supp. 419 (S.D.N.Y.1982); *Orth-O-Vision, Inc. v. Home Box Office*, 474 F.Supp. 672 (S.D.N.Y.1979); *Warshaw v. Hassid*, 41 A.D.2d 652, 340 N.Y.S.2d 666 (2d Dep't.1973), would likely apply. The Trustee's two fraud based claims asserting that, in reliance upon Bradford's alleged misrepresentation that its lien did not embrace the Segregation Accounts, Lion transferred customer securities to those accounts and Bradford fraudulently transferred securities from the Segregation Accounts, would appear to permit parol evidence as to the true nature of those accounts.[10]

 Furthermore, the nature of the evidence itself, once admitted, strongly favors the Trustee. Notwithstanding the deposi-

10. Unlike *Leasco Corporation v. Taussig*, 473 F.2d 777 (2d Cir.1972) and *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), this is not a case where a written agreement denied reliance on representations.

tion testimony of some Bradford employees that lien coverage over the Segregation Accounts was intended, most testified that it was not, saying, for example "A Segregation Account is a Segregation Account. Securities put in that account are not for the purpose of doing equity calculations or providing security [for] loans." Most significantly, Bradford's internal documentation confirms that lien coverage was neither sought nor intended.[11] The Trustee's case would thus fit into that common class of cases where some employees may have been misinformed or their recollection may have been colored by hindsight, but where the documentation setting up the various accounts at Bradford is clear in its meaning.

In the face of that clarity, Bradford would seek to rely on the purported instruction by a Lion employee to transfer $10,000,000 from the Segregation Accounts to the Clearance Account. No transfer, however, was made. The Trustee, in addition to denying that such an instruction was given, accordingly gives little, if any credit to the assertion, observing, in his words "c'est la vie," that it was Bradford's documentation which distinguished between the two accounts for purposes of establishing its lien.

### (ii) *Equitable Subordination*

No such argument, however, is made with respect to the lien asserted by Bradford over the Clearing Account. The very documentation that indicates an absence of intent to embrace the Segregation Accounts also shows a full intention that the securities contained in the Clearance Account be subject to the lien.

The attack on Bradford's lien on securities contained in the Clearing Account thus lies in less discrete theories such as those noted above. On this record, the claim of equitable subordination in favor of the Trustee as representative of the estate as a whole would appear most tenuous. Neither the Trustee nor the objectors have identified any fraud or other inequitable conduct that resulted in harm to the estate. *See In re Multiponics, Inc.*, 622 F.2d 709, 714 (5th Cir.1980); *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977). If Bradford's conduct was inequitable and worked an unfair advantage as the Closed Repo Creditors allege, there is, however, no indication that such conduct, if any, resulted in harm to, or an unfair advantage over, anyone other than the Open Repo Creditors. It was they who upon Lion's filing found the securities they thought they had obtained subject to Bradford's asserted lien. Taking the theory to its ultimate conclusion would indicate that, if Bradford's lien over the securities in the Clearance Account is to be subordinated pursuant to Section 510(c) of the Bankruptcy Code, it would be in favor of the Open Repo Creditors. A. De Natale & P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Business Lawyer 417, 426 (1984). As the Closed Repo Creditors note in their brief, there is nothing that would prevent those creditors from giving up that benefit.

### (iii) *Bona Fide Purchaser*

A more potent challenge to Bradford's lien would seem, on this record, to lie on grounds that Bradford did not obtain its lien in good faith.

---

**11.** In a letter brief filed in violation of the briefing schedule set at the hearing and consented to by all parties, Bradford attempts to assert, for the first time before this Court, that it disagrees with the Trustee's evaluation of his claim against the Segregation Accounts having a strong probability of success. In so doing, it relies on *Weidinger Chevrolet, Inc. v. Universal C.I.T. Credit Corp.*, 501 F.2d 459 (8th Cir.1974); *Community Bank v. Jones*, 278 Or. 647, 566 P.2d 470 (1977); and *Borg-Warner Acceptance Corp. v. First National Bank of Pipestone*, 307 Minn.

20, 238 N.W.2d 612, 615 (1976). This belated and improper submission is not accepted. Moreover, these cases concern the issue of waiver by a secured party of its security agreement and assert the time honored proposition that waiver and estoppel require proof of reliance, no evidence of which has been presented on this record. While the Trustee made an off-the-cuff reference to those doctrines, his principal factual contentions lie not in such theories but are those noted in the text.

■ Pursuant to Section 8–301 of the New York Uniform Commercial Code, N.Y. Uniform Commercial Code § 8–301 (McKinney Supp.1983), a transferee generally takes the rights in a security possessed by the transferor.[12] "A bona fide purchaser in addition to acquiring the rights of a purchaser ... also acquires his interest in the security free of any adverse claim." N.Y.U.C.C. § 8–302(3). Section 8–302(1), in defining a bona fide purchaser, provides that a bona fide purchaser is a purchaser for value in good faith and without notice of any adverse claim....[13] In § 8–313(3), it is provided that such notice must have been received before a transfer becomes effective.

As to the degree of notice and knowledge required, § 8–304, *inter alia*, provides that mere "notice that the security is held for a third person or is registered in the name of or endorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims." § 8–304(3). Similarity, § 8–304(4) provides:

> "Except as provided in this section, to constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the security amounts to bad faith."

■ The principal inquiry here lies under § 8–304(4), added by the New York State Legislature upon adopting the Uniform Commercial Code in 1962. That section was designed to codify pre-Code New York authority "that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith." *Gutekunst v. Continental Insurance Co.,* 486 F.2d 194, 195–6 (2d Cir.1973). Whether either of those tests is met is to be determined "... on the basis of [examination of] *all* the facts surrounding this series of transactions." *Plano Savings & Loan Association v. Irving Trust Co. (In re Legel Braswell Government Securities Corporation ),* 695 F.2d 506, 514 (11th Cir. 1983) ("*Plano* ") (emphasis in original).

■ Here, the relevant facts adduced at the hearing bear heavily on the issues of good faith, knowledge and notice. There is evidence of Bradford having knowledge of adverse claims by the Open Repo Creditors at least as to some of the government securities in the Clearance Account and as to all of the government securities in the Segregation Accounts. The Clearance Account contained some securities that had been transferred from the Segregation Accounts. Furthermore, the names of all of Lion's customers, whether or not the securities were initially placed in the Segregation Account or the Clearance Account, were known to Bradford from its own internal daily records which listed the names of the parties to each transaction. While mere knowledge of the name of a potential-

---

**12.** Section 306.118(a) of the Federal Book Entry Regulations, 31 C.F.R. ¶ 306.118(a) (1984) does not preempt state law applicable to transfers involving non-members of the Federal Reserve System. *Wichita Federal Savings & Loan Association v. Comark,* 610 F.Supp. 406 (S.D.N.Y.1985).

**13.** Only transfers in certain specific ways specified by §§ 8–313(1)(c), (d)(i) and (g) qualify for bona fide purchaser status under § 8–302. In his brief, the Trustee asserts that the transfer to Bradford was effected pursuant to § 8–313(1)(b). If so, Bradford would not be a bona fide purchaser. The Open Repo Creditors, the Closed Repo Creditors, and apparently Bradford, seem to assume for purposes of evaluating and assessing the Settlement, that the steps necessary to clothe Bradford with bona fide purchaser status were taken or occurred and we do likewise. Were § 8–313(1) to be read literally, it is arguable that a security interest could be obtained only through satisfaction of the tests of §§ 8–313(1)(h) or 8–313(1)(i), for only those sections expressly refer to the acquisition of security interests and most of the other subsections refer to purchasers. Yet the preamble to § 8–313(1) would indicate that the term "purchaser" includes the transferee of a security interest and that §§ 8–313(1)(c), (d)(1) and (g) may apply to such transfers. To hold that a security interest in securities may be acquired only through § 8–313(1)(h) and (i) would seemingly be to hold that the transferee of a security interest could not be a bona fide purchaser. Absent strong indication that such a change in existing law was intended, § 8–313(1) should not be so interpreted.

ly adverse claimant would not constitute knowledge of suspicious circumstances, *see* § 8–304(3), here Bradford knew more. Its own records reveal the amount paid by those claimants and the deposition testimony of its officers and employees confirms that they knew that Lion was entering into repo transactions with them whereby the customers obtained an interest in the securities and could put them back to Lion at the end of a specified period.

To be sure, this evidence may not amount to the blatant facts considered in the early case of *Morris v. Muir,* 111 Misc. 739, 181 N.Y.S. 913 (Mun.Ct. City of N.Y. 1920) where a tattered 15 year old boy presented $400 worth of stolen Liberty bonds to a broker who purchased them without inquiry. The court, in holding the broker liable for conversion, ruled that "[A]lthough gross negligence does not of itself constitute bad faith as a matter of law, it is evidence from which bad faith might be inferred" 111 Misc. at 742, 181 N.Y.S. 913.

Rather, the limited facts presented here bear some resemblance to those in *Plano.* There, the defendant bank served as clearing agent and lender to a government securities dealer from whom it had received a security interest in all property and securities of the dealer that were in the bank's possession. To secure an obligation of the plaintiff to the dealer, the plaintiff pledged to the dealer a GNMA certificate which was delivered by the plaintiff to the bank. In reregistering the certificate in its own name and that of the dealer, the bank learned that it was to be held on behalf of the plaintiff and that reregistration was contrary to plaintiff's contemplation. The Eleventh Circuit, in upholding the determination of the bankruptcy court that the lien was invalid, concluded that the bank's "... disregard for suspicious circumstances, of which it had actual knowledge, constituted a taking in bad faith." 695 F.2d at 512. In so ruling, it followed the bankruptcy court's observation that the "true facts could have been learned easily and quickly [through the] simply expedient [sic] of a telephone call to Plano." 695 F.2d at 513.

Instructive is the *Plano* court's distinguishing of *Irving Trust Company v. Westchester County Savings and Loan Association (In the Matter of Legel, Braswell Government Securities Corp.),* 648 F.2d 321 (5th Cir.1981), on the grounds that GNMA certificates there were pledged by the broker without restriction, were freely negotiable, and were accompanied by forms negating the claimant's ownership interest. The certificates were delivered by an independent broker/dealer. Mere knowledge that the claimant may have had an interest was held insufficient to place the bank on notice of the claim. *Accord, United States Fidelity and Guaranty Company v. Royal National Bank of New York,* 545 F.2d 1330, 1335 (2d Cir.1976) (absent knowledge of suspicious circumstances, a broker has no duty to inquire of the bona fides of its customer's customers.) *See also* § 8–304(3).

Here, however, the presence of at least some securities in the Segregation Accounts prior to transfer to the Clearance Account gave knowledge that they were being held for Lion's customers. That the securities were employed in repo transactions would seem to have further indicated the existence of claims adverse to them. The direct payment by Lion customers to Bradford for government securities is somewhat akin to the delivery in *Plano.* Unlike in *Irving Trust,* there could not have been any thought that a repo purchaser may have transferred the securities to an independent entity.

To these factors, the Closed Repo Creditors observe that many school districts and municipalities located in New York State were repo purchasers. Consequently, they argue that Bradford was charged with knowledge (i) that under New York law such entities may only purchase government securities and are prohibited from making loans to private firms even if securities are received as collateral and (ii) that securities invested in by such entities may be held by a bank only as custodian. They

further assert that transactions violative of such constraints are void.

These notions rest on virtually identical provisions of the New York General Municipal Law § 11 (McKinney 1977) and the New York Education Law §§ 1604–a and 1723–a (McKinney Supp.1983), which implement the general limitations on loans by municipalities and school districts to private corporations and associations contained in the New York State Constitution. McKinney's Const. Art. 8, § 1 (McKinney 1969). Pursuant to those sections, such entities are permitted to invest, *inter alia*, in obligations issued by the United States. For school districts, "[S]uch obligations, where possible, shall be registered or inscribed in the name of the school district for which the investment is made." N.Y. Education Law §§ 1604–a(2)(a), 1723–a(2). Furthermore,

> Such obligations, unless registered or inscribed in the name of the school district, shall be purchased through, delivered to and held in the custody of a bank or banker designated by the board of education for the deposit of school district moneys.

N.Y. Education Law §§ 1604–a(3), 1723–a(3). For municipalities, the same restrictions apply, except that the City of New York may purchase through, deliver to and have held on its account such obligations by "a reputable dealer in such obligations as shall be designated by the state comptroller." N.Y.Gen.Mun.Law § 11(2)(b); Op.St.Comp. 83–21.

Thus, in addition to the suspicious circumstances noted above, it appears that Bradford, cognizant that New York school districts and municipalities were among Lion's customers, could be charged with knowledge of these constraints. *E.g., City of Zanesville v. Mohawk Data Sciences Corp.*, 97 A.D.2d 64, 66–67, 468 N.Y.S.2d 271, 293 (4th Dep't 1983); *Village of Canastota v. Queensboro Farm Products, Inc.*, 44 A.D.2d 276, 354 N.Y.S.2d 451 (3d Dep't. 1974), *aff'd mem.*, 36 N.Y.2d 793, 369 N.Y.S.2d 700 (1975); 10 E. McQuillen, *Municipal Corporations*, § 29.04 (3d ed.

1981). These cases deal with persons having direct dealings with the public entity; they also concern failure to follow appropriate resolutions or follow formal rules by which public bodies are to act. While no New York case has been called to our attention that imposed such knowledge on persons not having direct dealings, it would appear that the New York courts would so find in a case such as this.

First, the imposition is rooted in the strong public policy of protecting public funds from dissipation through failure to comply with the protective measures of constitution and statute. *See e.g., Lutzken v. City of Rochester*, 7 A.D.2d 498, 99, 184 N.Y.S.2d 483, 486 (4th Dep't.1959).

Second, the constraints here lie not in an unknown failure to comply with requirements for obtaining authority as in the cases noted above. They concern crystal clear provisions of law that preclude loans to private entities and permit the purchase of only certain obligations under stringent conditions. Among these is that such obligations may only be "purchased through, delivered to and held in the custody of a bank" appropriately designated by the school boards of school districts having interests in the securities in the Clearance and Segregation Accounts. Unlike the cases noted above, here Bradford knew the facts, *i.e.*, that school districts and municipalities had an interest in Lion securities and that the assertion of its lien was inconsistent with the custodial function prescribed. Like all citizens, it is presumed to know the law.

Third, Bradford, given the large volume of business for just one of its customers, can hardly be said to be unsophisticated in this area. Fourth, Bradford accepted sums directly from these public bodies. Thus, it was not so far removed from the transaction that holding it to these constitutional and statutory provisions is at all untoward.

Such a result sustaining the lack of authority of a school district or municipality to enter into such a transaction in the face of a claim by a third party is, for these reasons, hardly unknown or unfair. *Chem-*

*ical Bank v. Washington Public Power Supply System*, 99 Wash.2d 772, 666 P.2d 329 (1983) *(en banc); reconsidered and reaff'd*, 102 Wash.2d 874, 691, P.2d 524 (1984) *(en banc )* ("WPPSS"). There a debenture trustee for thousands of public authority revenue bond holders and some bond holders themselves sought to compel several municipalities to comply with an agreement to purchase electricity. In dismissing the action the court held that the agreements could not be enforced by the third parties since the municipalities lacked statutory authority to enter into them. The agreements were held *ultra vires* even though a virtually unconditional promise to pay contained therein provided the principal revenue stream upon which the bonds were marketed. Here Bradford was closer to the transaction than the debenture trustee in *WPPSS* and the lien it asserts is directly contrary to the statutory requirement of custodianship.

██ Only this latter point is seriously disputed by the Trustee and only briefly.[14] Rather, he observes that the cases relied on by the Closed Repo Creditors for the proposition that transactions with public bodies not in accord with limited statutory authority are void, *e.g., Union Free District No. 3 v. Town of Rye*, 280 N.Y. 469, 480, 21 N.E.2d 681 (1939), serve only to establish a defense of *ultra vires*. It is thus claimed that the doctrine only serves as a shield to protect New York school districts and municipalities from the enforcement of contractual claims and may not be employed as a sword to enable school districts to characterize claims and enforce the characterization.

The shield versus sword argument, even if accepted, does not, however, reflect the posture of the proceeding. This is a case commenced by Bradford pursuant to § 506 of the Bankruptcy Code in order to establish its lien. On that issue, the prohibition on school district use of public funds is asserted defensively. Whether the doctrine could be employed offensively is irrelevant here.

██ From Bradford's knowledge of school districts having claim to repo securities held in the accounts over which it asserts a lien, when coupled with the other facts noted and Bradford's imputed knowledge of the restraints on school district investments and that securities in which they invested could be held by a bank only as custodian, a trier of fact might well find suspicious circumstances calling for inquiry.[15] As observed in *Plano*, it is likely that a few telephone calls to the school districts and municipalities that wired funds to it might have revealed that the school districts thought the securities were held by Bradford solely as custodian and for safekeeping.

██ Review of all the facts contained in the record thus indicates that the Trustee may have at least a fair probability of success in sustaining his claim that Bradford's asserted secured claims should be disallowed and be permitted only unsecured status. Such a probability would include the securities in the Segregation Accounts even were Bradford to prevail in its contention, *see* n. 11 *supra*, that its lien embraced them.

██ But in this exercise, we would note that our ability to canvass the issues and to form an opinion as to reasonableness is hampered by the lack of factual information and the presence of other issues that

---

**14.** Bradford, in its belated letter brief disputes that the repos were loans to BTC, contests that it should be charged with knowledge that they were loans to Lion and denies that it had a fiduciary duty to the Open Repo Creditors. Analysis under § 8–304(4), however, does not rest on the existence of a fiduciary duty but on a failure to investigate suspicious circumstances. In addition, the issue is not whether Bradford should be charged with knowledge of a loan characterization, but whether it is to be charged with knowledge of adverse claims.

**15.** That duty is far less than a more formal relationship whose breach may amount to fraud under securities laws for which damages are recoverable. *See Edwards & Hanley v. Wells Fargo Securities Clearance Corporation*, 602 F.2d 478 (2d Cir.1979); *Chasins v. Smith Barney & Co.*, 438 F.2d 1167 (2d Cir.1970).

no one has seen fit to address. The Trustee's assessment of only tangible evidence in determining whether Bradford knew of Lion's fraud leaves us unable to assess whether other intangible evidence would amount to another suspicious circumstance impacting the validity of Bradford's lien. Moreover, the transactions in question have not been particularized with reference to whether Bradford, prior to Lion's having entered into a repo transaction with respect to a particular government security, had perfected a lien with respect to that security. If so, § 8–313(3) would seemingly immunize the lien from subsequent notice of adverse claims. In that event, the lien would apparently be subject to attack only by a bona fide purchaser, and the open question regarding the Open Repo Creditor status as bona fide purchasers, *see infra,* would need to be addressed.[16]

### (B) *The Trustee's Preference Claims Against Bradford*

In alleging two claims under § 547 of the Bankruptcy Code, the Trustee attacks as preferences the transfer of government securities having a par value of $88,195,000 from the Segregation Accounts to the Clearance Account within the 90-day period prior to bankruptcy. He also asserts that in transferring the securities from one account to the other Bradford created a preference through improving its position with respect to the secured nature of its loan.

Section 547(b) of the Bankruptcy Code enables a trustee to avoid transfers of property of the debtor to non-insiders for or on account of an antecedent debt which were made within 90-days of the filing of the petition while the debtor was insolvent and enables the transferee to receive more than it would under Chapter 7 if the payment were not made. Section 547(c) excludes certain types of transfers, three of

which are said to be potentially material here: (i) transfers intended to be and actually were a substantially contemporaneous exchange for new value given to the debtor, 547(c)(1)(A); (ii) transfers made within 45 days after the antecedent debt was incurred if the debt was incurred and the transfer made "in the ordinary course of business or financial affairs of the transferee" and "made according to ordinary business terms," § 547(c)(2); and (iii) transfers of a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers caused a reduction, as of the date of the filing of the petition, of the unsecured portion of the debt. The reduction, if any, is to be computed from the later of "90 days before the date of the filing of the petition" or "the date on which new value was first given under the security agreement creating such security interest." § 547(c)(5).

There appears to be no dispute as to Lion's insolvency or any evidence that would rebut the presumption of same afforded by § 547(f) of the Bankruptcy Code. Nor is there any dispute that Bradford received more than it would have on liquidation. But there was no attempt made to quantify the assertions contained in paragraphs 41 and 42 of his Amended Answer and Counterclaims that government securities were transferred from the Segregation Accounts to the Clearance Account, and that "Lion Capital Group sold substantially all of the Preference Securities and applied a portion of the proceeds of the sale to reduce its indebtedness to [Bradford]" and that some of the securities remained in the Clearance Account on May 2, 1984.

Similarly, with respect to the exceptions contained in § 547(c)(1), there are references to Bradford having given new value (*e.g.,* Trustee's Br. p. 25), but the amounts

---

**16.** Also not addressed is whether the Trustee, standing in the "overshoes" of an unsecured creditor, *In re Leichter,* 471 F.2d 785, 787 n. 4 (2d Cir.1972), pursuant to § 544(b) of the Bankruptcy Code, may have a further basis to set aside Bradford's lien. It is not our task to seek out further theories for a trustee and we are loathe to do so. The Settlement would dismiss all claims by the Trustee including his § 544(b) claims. Whether the Trustee has any § 544(b) claims should have been revealed and taken into account by the Trustee in exercising his judgment.

of that value and the dates it was given are not in the record. The Trustee asserted that some may have been given and that numerous "spread sheets" had been prepared analyzing the various transactions. These were not produced. It would seem likely that transfers from the Segregation Accounts prior to the two week period before bankruptcy may have been in the ordinary course of business. But there is no evidence relating those transfers to new value or indicating if they were made in payment of a debt incurred within the 45 day period. We are thus disabled from meaningfully reviewing the preference claim relating to these transfers.

But during the two weeks before Lion filed its petition, securities having a par value of $21 million were allegedly so transferred, including $5 million on the day prior to filing. It would hardly seem that these transfers could have been in the ordinary course. Whether they were in exchange for new value we cannot assess. Although the Trustee referred to Bradford advances, he has not particularized them, asserting that the volume of transactions would call for too complex a calculation.

For the same reason, we are also unable to review and assess the Trustee's improvement of position claim. That claim is based on the allegation that during the period from April 18, 1984 to May 2, 1984, Bradford reduced the unsecured portion of its loan by $7.58 million by transferring securities from the Segregation Accounts to the Clearance Account. In supporting the Settlement, the Trustee repeatedly asserts that the viability of this claim depends on making the comparison as of the 14th day rather than the 90th day prior to the petition date and that he enjoys no great probability of success in doing so. The legislative history pertaining to § 547(c)(5) indicates that

> The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and

on the date of the petition. If new value was first given after 90 days before the case, the date on which it was first given substitutes for the 90-day point.

House Report No. 95–595, 95th Cong., 1st Sess. 374 (1977); Senate Report No. 95–989, 95th Cong., 2nd Sess. 88 (1978), U.S. Code Cong. & Admin.News 1978, 5787, 5874, 6330. Thus, in order to assess this claim, the references to new value need be particularized. Presumably, given the clear statutory language, the Trustee had such references in mind in framing his amended counterclaim. Far more than mere references to Bradford advances in general is required for a court to canvass the claim in light of an appropriate comparison date and to assess the Trustee's probability of success in prevailing upon it. *E.g., Flight Transportation,* 730 F.2d at 1138.

### C. *The Trustee's Fraudulent Conveyance and Fraud in the Inducement Claims Against Bradford*

■ We are similarly precluded by the lack of evidence on the record from estimating the Trustee's probability of success in his claim that Bradford transferred government securities having a par value of $69,610,000 from the Segregation Account in fraud of creditors. These claims are hardly briefed by the parties and appear to have been overlooked.

### D. *The Preference Claims Against The Open Repo Creditors*

In asserting these claims, the Trustee pleads that the payments made by Lion in satisfaction of repurchase obligations within the 90 day period prior to May 2, 1984, were made while Lion was insolvent, and were on account of an antecedent debt and thus recoverable under § 547 of the Bankruptcy Code.[17] As to insolvency, the Trustee here too apparently rests on the presumption afforded by § 547(f) and no one asserts that the presumption may be rebut-

---

**17.** The Open Repo Creditors have not asserted that § 546(f) of the Bankruptcy Code, added by P.L. 98–353 (July 10, 1984), which would preclude challenges to payments made to close out repos as preferences, applies to this bankruptcy case which was commenced prior to the amendment.

ted. Nor was any evidence presented regarding whether repurchase obligations allegedly incurred with respect to 45 days or less repos, were incurred and payments made in the ordinary course of business or financial affairs of the debtor and the Open Repo Creditors thereby failing to indicate the viability of the defense provided by § 547(c)(2) of the Code.

The Trustee has advanced not a single substantial reason supported by evidence as to why he may not enjoy a high probability of success with respect to these claims. It is all too apparent why this approach was taken: the Trustee has put himself in the position of advancing the Settlement which would resolve these claims while pursuing identical causes of action in this Court against the Closed Repo Creditors on the basis of repo transactions concededly undistinguishable from those sought to be settled.

As presented by the parties, the viability of the Trustee's preference claims against the Open Repo Creditors largely turns on the issue of whether or not they obtained an ownership or security interest in the securities which were the subject of the repos. If so, the argument is that upon closing of the repos they would have either sold the repo securities back to the debtor or released their interest in them rather than having received payment of antecedent debts. § 547(b)(2). The distinction between ownership and security interest is apparently of concern only if the value of the government securities at the time of closing such repos was less than the payments made.

Not denying or limiting their own probability of success on this score, the Open Repo Creditors assert that determination of the issues involves examination of the complex and unresolved interplay between the federal regulations pertaining to uncertificated securities and N.Y.U.C.C. § 8–313 as amended in 1982. Putting aside the question of whether complexity by itself could support a finding that a settlement is reasonable absent an evaluation of probability of success, it would appear that the recent decision in *Wichita Federal Savings & Loan Ass'n v. Comark,* 610 F.Supp. 406, (S.D.N.Y.1985) (*"Comark"*) has resolved many of those issues in a factual context somewhat similar to that presented here.

In *Comark,* a limited partnership conducted a business of buying and selling government securities on behalf of its customers among whom were the plaintiffs. A bank having an account at the Federal Reserve Bank of New York served as the partnership's clearing agent for government securities traded through electronic book entry procedures. To secure a loan by the bank, it was granted a floating security interest on the contents of the partnership's clearance and demand deposit accounts. When the bank foreclosed, among the securities in the accounts were securities purchased by the partnership for plaintiffs through repo or reverse repos. Denying the bank's motion for summary judgment, the court found that material issues of fact existed concerning whether the bank, upon being allegedly informed by the partnership that the securities belonged to its customers, should have taken steps to identify the securities as belonging to the plaintiff.

In so holding, the Court ruled that the provisions of Article 8 of the New York U.C.C. with respect to the rights of persons who are not members of the Federal Reserve System are not preempted by § 306.-118(a) of the federal book entry regulations, Treasury Circular No. 300, Sub Part O, 31 C.F.R. § 306.118(a) (1973). *Comark,* 411–12. It was further ruled that § 306.118(b) had the effect of displacing state law insofar as it excludes the applicability of Article 9 of the U.C.C. and did not completely preempt the delivery requirements then pertaining to transactions by non-members prior to September 1, 1982 (the effective date of N.Y.Laws 1982, Ch. 928 amending Article 8). *Comark,* 413. Applying state law as it then stood, the court, relying on such cases as *Louisiana State School Lunch Employees Retirement System v. Legel, Braswell Govern-*

*ment Securities Corporation,* 699 F.2d 512 (11th Cir.1983); *Levy v. Chemical Bank (In the Matter of Scott Gorman Municipals, Inc.,* 28 B.R. 659 (S.D.N.Y. 1983); and *Matthysse v. Securities Processing Services, Inc.,* 444 F.Supp. 1009 (S.D.N.Y.1977), further ruled that delivery of a confirmation slip to the transferee identifying book entry securities as belonging to him where the securities are in the "possession" of the transferor's clearing agent through the operation of the required book entries would satisfy the delivery requirement of former § 8–313(1)(c) were the securities identified as that section required. *Comark,* 413.

*Comark* was brought under Article 8 as it stood prior to adoption of the 1977 Official Amendments by New York in 1982. As amended, the Article 8 rules regarding transfer are largely set forth in § 8–313(1). In pertinent part, that section provides that

Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only

\* \* \* \* \* \*

(d) when a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser

(i) a specific certificated security in the financial intermediary's possession; or

\* \* \* \* \* \*

(iii) a quantity of securities which constitute or are part of a fungible bulk of securities shown on the account of the financial intermediary on the books of another financial intermediary; or

\* \* \* \* \* \*

---

**18.** These particular sections are identified by the parties to this proceeding. Whether other sections, such as 8–313(1)(h) and (i), apply has not been briefed and we made no assessment of their applicability.

**19.** The applicability of § 8–313(1)(d)(iii) regardless of whether the securities are in certificated or uncertificated form, as the Closed Repo Creditors claim, has not been fully briefed. If that section applies only to uncertificated securities, a primary issue is whether that portion of § 301.118(b) deeming book entry securities to be in bearer definitive form requires application

(g) when appropriate entries to the account of the purchaser or a person designated by him on the books of a clearing corporation are made under Section 8–320 . . .[18]

A financial intermediary is defined by § 8–313(4) to be "a bank, broker, clearing corporation or other person (or the nominee of any of them) which in the ordinary course of its business maintains security accounts for its customers and is acting in that capacity." On this record, Lion and Bradford would appear to be such. *Matthyse v. Security Processing Services, Inc.,* 444 F.Supp. 1009 (S.D.N.Y.1977); *Scott Gorman Municipals Inc.,* 28 B.R. at 659; *cf. In the Matter of Paragon Securities Company,* 599 F.2d 551 (3d Cir.1979).

It would also appear that the Lion internal records may, assuming that the sample transaction is typical, constitute sufficient identification of an interest by a particular Open Repo Creditor in repo securities. Even though Lion is before the Bankruptcy Court, identification is to be determined under the U.C.C. *Scott Gorman Municipals,* 28 B.R. at 662–63. Those records before us relate to the security in specific detail. Whether the Bradford internal records are sufficient is more difficult to determine. The records in evidence do not expressly relate the entity to the securities. Whether they sufficiently identify the security to a fungible mass under § 8–313(1)(d)(iii) needs further exploration.

If the rules as to certificated securities apply to these book entry transactions,[19]

of the Article 8 provisions pertaining to certificated securities and, if so, whether the requirements of § 8–313(1)(d)(i) have been satisfied. Section 306.118(b) of the federal book entry regulations provides in pertinent part:

(b) A transfer or a pledge of transferable Treasury securities, or any interest therein, which is maintained by a Reserve Bank (in its individual capacity or as Fiscal Agent of the United States) in a book entry account under this subpart, including securities in book-entry form under Sec. 306.117(a)(3), is effected, and a pledge is perfected, by any means that

there would remain to be resolved the issue of whether Bradford had sufficient possession of book entry government securities under § 8–313(1)(d)(i) through its relationship with the Bank of New York, its clearing agent. As noted, *Comark,* under the pre-1982 version of § 8–313, would so indicate. Whether Bradford had a sufficient relationship with repo creditors through receiving sums directly from them or otherwise, to serve as an intermediary under § 8–313(1)(d)(i) would remain to be answered. If not, whether Lion can be said to also have constructive possession also remains to be considered. While *Comark* and the cases noted above indicate that a clearing relationship with a depository bank such as the Bank of New York affords constructive possession, no case has been called to our attention where that doctrine was applied through two clearing relationships and possession found at the end of the chain. Although such a pass-through may be theoretically possible, no one has briefed the issue and other considerations may exist that would indicate otherwise.

 The availability of legal or factual argument to his adversary may justify a Trustee exercising his judgment within the bounds of reason in recognizing that argument in settling a case. *Carla Leather, Inc.,* 44 B.R. at 470 (S.D.N.Y.1984). That recognition, however, has not occurred here. The Trustee's unequivocal position is that he will prevail in his various preference claims against the several repo creditors. More flexibility in assessment may lie where the record at the hearing of the settlement reveals the existence of hotly debated factual questions concerning state of mind and other ephemeral issues interlaced with concern for the credibility of witnesses. The open issues pertaining to

the Trustee's preference claims against the Open Repo Creditors cannot be so characterized. Were this matter in any other posture, one would have expected that they be analyzed so as to support a reasoned estimate of whether or not the close out of a repo transaction in these circumstances is to be considered either (i) a sale of a security owned by a repo creditor or the release of collateral for cash or (ii) the payment by Lion of an antecedent debt.

Rather than undertake that exercise, the proponents have focused on the issue of whether the Open Repo Creditors were bona fide purchasers under § 8–302. Presumably this was done because of the Open Repo Creditors' claim to ownership of the securities at Bradford on the date of filing of the petition. That claim, however, belongs to them and not the Trustee. Its release in the Settlement might support the Trustee's assertion that the Settlement was negotiated as a package. But the Trustee testified to the effect that he could see no merit to the claim.

 All that the Open Repo Creditors could conclude is that there are several open questions with respect to the Settlement, particularly concerning the prerequisites to such status imposed by § 8–302. These are that the transferor take delivery of a certified security, have its transfer registered on the books of the issuer or the security be transferred pursuant to §§ 8–313(1)(c), (d)(i) or (g). Section 8–313(1)(c) is inapplicable since the securities here were not endorsed. The bearer form designation and constructive possession issues under § 8–313(1)(d)(i) have already been noted and, as observed by the Open Repo Creditors, a significant open issue lies with respect to § 8–313(1)(g) as to whether the entries made on the books of the Bank of New York or the New York Federal Re-

---

would be effective under applicable law to effect a transfer or to effect and perfect a pledge of the Treasury securities, or any interest therein, if the securities were maintained by the Reserve Bank in bearer definitive form. For purposes of transfer or pledge hereunder, book-entry Treasury securities maintained by a Reserve Bank shall, notwith-

standing any provision of law to the contrary, be deemed to be maintained in bearer definitive form....

If the rules applicable to uncertificated securities apply, the Open Repo Creditors assert that the issue is whether the provisions of § 8–313(1)(d)(iii), or § 8–313(1)(g) were satisfied.

serve Bank were sufficient to constitute entries to the account of the Open Repo Creditors. No evidence of those entries has been presented. On this record it is impossible to evaluate the soundness of the Trustee's judgment that the claim is of little merit.

## V

### *Best Interests of Creditors*

This inability to canvass the issues pertaining to the Trustee's causes of action against Bradford other than strong probability of success that he enjoys with respect to the securities in the Segregation Accounts leaves us in the position of being unable to find that the Settlement is in the best interests of creditors notwithstanding the considered judgment of the Trustee and the Open Repo Creditors.

A court can not find that a settlement by a trustee fits within the lowest bounds of reasonableness where a facially significant cause of action is glossed over and key facts relevant to others are not presented even in summary fashion. Particularly is that so where there is no allegation that the estate will have to incur significant discovery costs in developing those facts. The cost of trying the matter is no excuse. This is a case where a potential settlement was first announced on the eve of trial. Discovery as to all claims had been virtually completed. The facts are at hand concerning, for example, the applicability of § 8–313(3). They simply have not been sorted out. Approval is not permitted where the record reveals "gaping holes in the background of information" or where the support for a key element of the settlement is to be found in "unsubstantiated gratuitous declarations" even by a court appointed examiner. *United States v. Aweco,* 725 F.2d at 299.

This want of analysis is apparently due to the nature of the parties' determination to allocate the fund between the Trustee along lines whereby the Trustee would obtain the Segregation Accounts and Bradford retain the Clearing Accounts. As the Trustee testified in discounting his subordination claims and justifying the Settlement:

I did not find, as I said before, a basis which led me to conclude that the Trustee would be well advised to battle to the end on total subordination of Bradford's claim which means I am back to where I was as far as the Trustee is concerned:

Number one, Bradford in effect is getting what was in the clearance account at the date of the filing with no post-petition interest except for this $1.3 million dollars which is subject to coming back.

Number two, the Trustee is getting what was in the segregation accounts with the income between the date of liquidation and the date of closing.

Number three, we are fixing the claims of all of the parties to the litigation, some $51–52 million dollars worth of claims in the estate in a rather efficient and economical manner so that we don't have to fight about those anymore.

We are thus being asked to consider a settlement that reflects only the Trustee's strong probability of success in sustaining his claim with respect to the Segregation Accounts and little, if anything, else. No adequate explanation is given for the sharp discounting of his claim regarding the Clearance Account lien or his preference claims against Bradford.

Yet, at the same time we are told by the Trustee that he believes that he can sustain his preference claims against the Open Repo Creditors. The Settlement reflects no such judgment and the estate's receiving a portion of the Federal Cash Account is not tendered by the Trustee in support of relinquishing those claims. Contrary to his brief, the Trustee testified that he sees no basis for the Open Repo Creditors' claims to ownership of the securities in the Bradford accounts on May 2, 1985. In determining the likelihood of probability of success, a court may often not require a full blown legal analysis. But the particular issues relating to the preference claims against the Open Repo Creditors concern not just them but also the identical preference claims brought by the Trustee against

**190**

the Closed Repo Creditors and similar claims brought by the Trustee against two banks. In short, we are being asked effectively to either scuttle or sustain those identical claims on the basis of an incomplete presentation.

 No warrant for such action is contained on this record. Indeed, it would seem unlikely that such action could be justified absent highly unusual circumstances and even then it would be highly questionable. To the Trustee, the Settlement deserves support because it fixes the claims to the parties to the litigation, brings in a substantial sum to the Estate and enables him to begin formulation of a plan. However laudable those goals might be, they do not support either the procedural timing of this motion in view of identical pending litigation or the relinquishment, without the court being able to make adequate analysis, of claims advanced by a trustee. Moreover, this estate, having $3 million in its coffers is hardly unable, like the *Carla Leather* estate, *see* 44 B.R. at 457, to bear the cost of sorting these matters out and pursuing valid claims.

By this we should not be understood to say that the Trustee will ultimately prevail on all claims. It may be that he will prevail on some and fail on others. Enough occurred here, however, that demands further inquiry. Suspicious circumstances may likely have existed. It would seem that significant sums were transferred from the Segregation Accounts and substantial payments made on the eve of bankruptcy.

To this the Trustee, echoed by Bradford, asserts that the lowest level of reasonableness standard contemplates only a limited review. They thus would excuse the neglect of the fraudulent transfer claim and a failure to present facts enabling us to estimate the probability of success in Bradford's assertion of its lien over the Clearance Account and the Trustee's preference claims.

 The best interests of creditors, however, requires more than a trustee's

*ipse dixit* or request for reliance on his judgment. Where a settlement is objected to, findings and conclusions are appropriate. *See Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir.1982); *Patterson v. Newspaper & Mail Deliverers Union*, 384 F.Supp. 585, 588 (S.D.N.Y.1974), *aff'd* 514 F.2d 767 (2d Cir.1975) *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). No more than an ability to make a reasoned estimate is sought here.

Complexity and the presence of legal issues may indeed support a settlement. *Carla Leather* 44 B.R. at 471. And it is fundamental to the settlement process that parties be encouraged to resolve their disputes themselves. The lowest level of reasonableness standard affords the flexibility that such encouragement requires. Complexity and the presence of open issues do not excuse a failure to bring forth facts and thereby effectively negate the Rule 9019's requirement of a hearing where sufficient evidence is to be presented to permit appropriate analysis.

For the foregoing reasons, the motion to approve the Settlement is denied without prejudice.

IT IS SO ORDERED